In the

# United States Court of Appeals

### For the Seventh Circuit

No. 09-3282

JACKLIN L. JONES,

*Plaintiff-Appellant,*

*v.*

MICHAEL J. ASTRUE, Commissioner of
Social Security,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 2:09 CV 0061 RTR—**Rudolph T. Randa**, *Judge.*

ARGUED APRIL 16, 2010—DECIDED OCTOBER 22, 2010

Before EASTERBROOK, *Chief Judge*, FLAUM, *Circuit Judge*, and HIBBLER, *District Judge.**

HIBBLER, *District Judge.* Jacklin Jones applied for disability benefits, but an administrative law judge denied her claim, reasoning that her testimony about her pain-

---

* The Honorable William J. Hibbler, District Judge for the Northern District of Illinois, sitting by designation.

induced functional limitations was not credible. The ALJ supported the credibility determination with references to the medical evidence, the opinions of treating physicians, and Jones's daily activities. The district judge affirmed the ALJ's decision, and Jones appeals. We affirm.

I.

Jones claimed to become disabled beginning in November 2003 as a result of injuries she sustained in a 2001 motor vehicle accident. Jones had sought treatment for her injuries from her physician, Dr. Susan Joseph, but when her condition worsened, Dr. Joseph referred Jones to an orthopedic surgeon, Dr. Richard Karr.

In March 2003, Jones complained to Dr. Karr of chronic lower back pain with radiation down her left leg. Jones informed Dr. Karr that she took Hydrocodone, prescribed by Dr. Joseph, to manage her pain. During his examination, Dr. Karr noted no pain behavior, a straight spine, normal bending, normal ability to straighten her legs, no limping and a normal gait. As a result of the examination, he informed Jones that her condition was benign. He advised Jones to stop taking Hydrocodone and to instead use a combination of anti-inflammatory and a benign analgesic to manage her pain. Dr. Karr further advised Jones to lose weight. Finally, Dr. Karr ordered an MRI to further assess Jones's condition.

After reviewing the results of the MRI a month later, Dr. Karr noted a mild disk bulge at the L4-L5 disk of the lumbar spine and diagnosed discogenic lower back pain

with associated myofascial leg pain. Dr. Karr again advised Jones to desist taking narcotic medication to control her pain and instead use other medication and to begin physical therapy. Dr. Karr did, however, refer Jones to Dr. Steven Donatello for pain management. Dr. Karr also discussed with Jones a surgical option to treat her pain, but advised her that it would be unpredict- able and should be used as a last resort. Jones agreed not to proceed with surgery at that time.

When Jones saw Dr. Donatello, he reviewed her MRI and diagnosed leg weakness, mild edema in her left foot, a L4-L5 disk bulge with lower back pain, and a L5 radiculopathy. Dr. Donatello gave Jones a series of epidural steroid injections, after which Jones's coworkers noticed that she was able to move around the office better and had decreased outward expressions of pain. Dr. Donatello also prescribed Percocet, a pain relief medication containing oxycodone and acetaminophen.

Despite the epidural steroid injections, Jones continued to complain of pain, and Dr. Joseph again referred her to Dr. Karr. In June 2003, Jones informed Dr. Karr that she was taking Percocet and continued to suffer severe pain. Dr. Karr noted that she was working without restric- tions, walking normally, and had normal straight leg raises and muscle strength. Dr. Karr again advised her to take a more benign pain medication and to pursue exercise or physical therapy. Dr. Karr also reminded Jones of surgical options.

Jones visited Dr. Joseph throughout 2003, who pre- scribed Darvocet and Oxycontin to relieve Jones's pain. In

November 2003, Jones quit her job as an accounts payable supervisor. At the time, Jones worked only part time and believed that other employees might be laid off if she did not quit.

In 2004, Dr. Joseph continued to refer Jones to Dr. Karr. In March 2004, Dr. Karr noted that she exhibited no signs of active radiculopathy. He opined that she had a bad back disk but that her presentation was "very benign." He noted that she was overweight and deconditioned, but did not exhibit pain behavior. Dr. Karr again advised her of surgical options to treat her pain, though he advised her against those options. Meanwhile, through 2005, Dr. Joseph prescribed various pain medication, including Oxycontin, a Lipoderm patch, Naprosyn, and Vicodin, though Jones did not always take the prescribed dosage of some medication because it made her dizzy. In August 2005, Dr. Joseph diagnosed bilateral carpal tunnel syndrome, and Jones began wearing wrist braces to alleviate her pain.

In April 2005, Dr. Richard Almonte, a non-examining State agency doctor, completed a physical residual functional capacity assessment. Dr. Almonte believed that Jones could lift or carry 20 pounds occasionally and 10 pounds frequently. He further believed that Jones could sit, stand, or walk for six hours in an eight-hour day. A second State agency doctor affirmed Dr. Almonte's opinion in October 2005.

In January 2006, Jones underwent another MRI. Dr. Joseph reviewed the 2006 MRI and diagnosed a small-to-moderate protrusion at the L3-L4 disk with

mild bilateral foraminal narrowing and a mild disk bulge at the L4-L5 disk of Jones's lumbar spine. In February 2006, Jones began to see Dr. Michael Belete instead of Dr. Joseph. Like Dr. Joseph, Dr. Belete referred Jones to a specialist, neurologist Dr. Max Lee.

Dr. Lee reviewed the 2006 MRI and found a mild amount of degenerative disease around the L4-L5 disk and to a lesser extent at the L3-L4 disk of the lumbar spine. Dr. Lee opined that it was difficult to attribute all of Jones's symptoms to the MRI and recommended that she continue conservative pain management and explore surgery if she did not improve.

Throughout 2006 and 2007, Dr. Belete continued Jones on various pain medications and referred her to a pain management clinic. Jones complained to Dr. Belete that the medication made her both dizzy and drowsy. Dr. Belete also ordered various medical tests to determine the extent of Jones's injury. In August 2006, a nerve conduction study produced results consistent with carpal tunnel syndrome. In September, Dr. Belete noted that Jones continued to use wrist splints and referred her to a hand surgeon. In October 2006, Dr. Belete prescribed another epidural steroid injection. A November 2006 bone scan revealed a 12% decrease in bone mineral density loss, consistent with osteopenia.

At a 2007 hearing before the ALJ, Jones testified that she had been unable to work due to the back pain associated with her 2001 accident that had worsened over time. She testified that, before she quit her job, walking to a co-worker's office had been painful and often had

required her to take pain medication upon return to her office. Jones further testified that she would sometimes attempt to control her pain by lying on the floor of her office.

When describing her lower back pain, Jones testified that it made it difficult to sit or stand for long periods and also that it was irritated by movement. She stated that she could sit for an hour or stand for a half an hour on a "good day" and that she could walk for two blocks before needing a rest. She also testified that the pain impairs her concentration and that pain medication makes her dizzy, drowsy, fatigued, and nauseated. Jones stated that she opted to forego surgery to treat her lower back pain because her doctors informed her that it would be "iffy."

Jones also testified that her carpal tunnel syndrome makes her hands go numb and makes it difficult to hold onto things. She testified that she could lift 10 pounds but that it would cause her pain afterwards. She stated that she wears a brace to relieve some symptoms of her carpal tunnel syndrome and that the brace has alleviated some of the symptoms. Jones testified that she did not explore other treatment options for her carpal tunnel syndrome because her insurance did not cover either examinations or treatments.

Despite her pain, Jones was able to complete an associate's degree. Jones informed the ALJ that she attended school from 2002-2006, taking classes one or two evenings per week. She completed a two-year associate's degree in business management during that four-year

period. She testified that she would sit at the back of classrooms and take breaks to control her pain.

Jones also testified that she does some household chores. When she folds laundry, a family member carries the basket to her. She occasionally washes dishes or vacuums, but has trouble standing to do so. She uses a computer to monitor her bank account and her children's internet activity. She testified that her pain prevents her from doing activities that she used to enjoy, such as fishing, skating, volunteering at her children's schools, and directing a church choir. She testified that she does not exercise, despite her doctors' recommendations that she do so, because of the pain associated with it. Both Jones and her husband testified that she spends much of her time lying down in her bedroom.

In addition, a vocational expert testified at Jones's hearing. The ALJ posed hypothetical questions to the vocational expert, directing him to assume an individual with Jones's vocational experience who was limited to sedentary work but who could focus only on simple, routine, unskilled and repetitive tasks. The vocational expert responded that Jones's past work was eliminated, but that such a hypothetical individual could do unskilled sedentary work, such as work as an assembler, order filler or information clerk. The vocational expert testified that there were over 15,000 such jobs in the state of Wisconsin. The ALJ then added detail to the hypothetical, directing the expert to assume an individual who must sit for an hour then get up to

stretch for a few minutes, but who sat for at least six hours during the day. The vocational expert responded that such a requirement would not preclude the hypothetical individual from working in unskilled sedentary positions. The expert also testified that a hypothetical individual who wore wrist braces would not be able to fulfill the position of assembler (6,340 jobs), but could fill approximately half of the positions of order filler and information clerk.

The ALJ found that Jones was not disabled, employing the required five-step analysis prescribed by 20 C.F.R. § 404.1520. The ALJ found that Jones had severe impairments in the form of back pain with degenerative changes in the lumbar spine, carpal tunnel syndrome, and obesity. Because these impairments did not meet or equal any impairment listed in the Regulations as automatically disabling, the ALJ determined Jones's residual functional capacity. The ALJ concluded that Jones's residual functional capacity did not allow her to perform her past work but that it did allow her to perform sedentary work that is simple and routine. In reaching this decision, the ALJ believed that Jones's medically determinable impairments could produce the symptoms about which she complained but that Jones's testimony about the intensity, persistence and limiting effect of those symptoms was not credible. In support of the decision, the ALJ considered in detail the objective medical evidence, Jones's daily activities, and Jones's testimony about her limitations. The district judge found that substantial evidence supported the ALJ's opinion.

II.

Because the Appeals Council declined review, the ALJ's ruling is the final decision of the Commissioner. *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008). We review *de novo* the district court's judgment affirming the Commissioner's final decision, meaning we review the ALJ's decision directly. *Moss v. Astrue*, 555 F.3d 556, 560 (7th Cir. 2009). We also review *de novo* the ALJ's legal decisions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). We review the ALJ's factual determinations deferentially and affirm if substantial evidence supported the decision. 42 U.S.C. § 405(g); *Craft*, 539 F.3d at 673. Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). The ALJ is not required to address every piece of evidence or testimony presented, but must provide a "logical bridge" between the evidence and the conclusions so that we can assess the validity of the agency's ultimate findings and afford the claimaint meaningful judicial review. *Getch*, 539 F.3d at 480.

The ALJ's credibility determinations are entitled to special deference because the ALJ has the opportunity to observe the claimant testifying. *Castille v. Astrue*, ___ F.3d ___, ___, 2010 WL 3188930, at *5 (7th Cir. Aug. 13, 2010). Rather than nitpick the ALJ's opinion for inconsistencies or contradictions, we give it a commonsensical reading. *Id.* Accordingly, we reverse credibility determinations only if they are patently wrong. *Id.*

### III.

Jones argues on appeal that the ALJ's credibility deter-mination is not supported by substantial evidence and further that the ALJ's credibility determination taints the conclusion regarding her residual functional capacity. Jones points to several flaws in the ALJ's opinion that affected the credibility determination: (1) the ALJ mistakenly found a gap in Jones's pursuit of treatment; (2) the ALJ improperly construed Jones's daily activities as inconsistent with Jones's allegations of pain; (3) the ALJ mistakenly relied upon Jones's decision to forgo surgery; and (4) the ALJ did not discuss all of the objec-tive medical evidence.

Before we begin, it is important to note just how much of Jones's testimony that the ALJ *did* credit. Although the agency physicians opined that Jones could do light work, the ALJ stated that she was giving Jones the benefit of the doubt. Among other things, the ALJ credited Jones's testimony that she could sit only for one hour and so instructed the vocational expert to consider a hypothetical claimant who frequently had to change positions. The ALJ further credited Jones's testimony that her medication sometimes made her drowsy or dizzy and instructed the vocational expert to consider a hypo-thetical claimant who could focus only on simple, routine, unskilled and repetitive tasks. Finally, the ALJ credited Jones's testimony that she was required to wear a wrist brace and instructed the vocational expert to consider a hypothetical claimant with such a limitation.

Jones first argues that the ALJ mistakenly relied upon a "gap" in Jones's treatment to determine her credibility

and that the district court erred in concluding that the error was harmless. When making the credibility determination, the ALJ opined that there were "gaps in treatment," commenting that Jones "saw Dr. Joseph in August 2005 and then not again until March 2007." The district court noted that the ALJ inaccurately described the record, observing that Dr. Joseph treated Jones through 2005 and even in January 2006. The district court did state that "there does appear to be a gap in the medical treatment from January 2006 to March 2007." Although Jones did not receive treatment from Dr. Joseph through most of 2006, she received treatment from Dr. Belete on a monthly basis throughout 2006. Jones also received treatment from Dr. Lee in 2006. Neither the ALJ nor the district court discussed Drs. Belete's or Lee's treatment records.

Undisputedly the ALJ erred in finding that there were "gaps" in Jones's pursuit of treatment. That error does not necessarily mean the ALJ's credibility determination was patently wrong. Reading the ALJ's opinion as a whole, we cannot say that the ALJ's mistaken finding that Jones temporarily avoided treatment undermines the credibility determination.

The ALJ's mistaken statement regarding a gap in treatment is embedded within a lengthy discussion of objective medical evidence that directly contradicts Jones's allegations of disabling pain. The ALJ noted that Drs. Karr and Joseph consistently described her symptoms as non-debilitating, labeling them as benign, finding a normal gait, and observing that she did not

exhibit pain behavior. Treating physicians' opinions regarding the nature and severity of a claimant's symptoms normally are given controlling weight when well-supported by medically acceptable clinical and diagnostic techniques, *Moss*, 555 F.3d at 560, and the ALJ observed that Jones's treating physicians diagnosed only mild degenerative change in her spine based on the results of the MRI. Moreover, the ALJ observed that none of Jones's treating physicians opined that she was disabled.

Jones implies that the ALJ based the credibility determination on the absence of medical evidence. Although the ALJ reported that Dr. Karr did not observe any signs of active radiculopathy, the ALJ discussed at length Drs. Karr and Joseph's opinion that the objective medical evidence demonstrated that Jones's presentation was benign and mild. Although an ALJ may not ignore a claimant's subjective reports of pain simply because they are not supported by the medical evidence, discrepancies between the objective evidence and self-reports may suggest symptom exaggeration. *Getch*, 539 F.3d at 483. Here, the objective medical evidence consistently revealed only mild degenerative change, and the ALJ properly relied upon the discrepancy between the objective evidence and Jones's self-reports.

Even if the ALJ had not mistakenly assumed that Jones received no treatment during the bulk of 2006 and had instead discussed Drs. Belete's and Lee's treatment notes, those notes were consistent with those of Drs. Karr and Joseph. Dr. Lee, for example, observed that

the degenerative disease around the L4-L5 disk was mild and opined that not all of Jones's symptoms could be attributed to the degenerative change revealed by the 2006 MRI. The ALJ's mistake concerning Jones's pursuit of treatment does not undermine the substantial evidence that supports her credibility determination, and we cannot say that her determination is "patently wrong" based solely on that mistake.

Jones next argues that the ALJ did not assign proper weight to Jones's daily activities—pointing out that neither Jones's completion of an associate's degree in four years nor her domestic activities were "inherently inconsistent" with her allegations of disabling pain. Thus, Jones argues, the ALJ should not have relied on such facts to find that Jones was not credible. An ALJ may not ignore a claimaint's limiting qualifications with regard to her daily activities. *Moss*, 555 F.3d at 562. That is not, however, what the ALJ did here. Although the ALJ could have discussed Jones's daily activities in more detail, she did not exaggerate Jones's testimony regarding her daily activities. The ALJ observed that Jones did not do much housework and that her children helped with the housework, and so did consider the qualifications Jones placed on her daily activities. The ALJ also noted that Jones's daily activities were consistent with her testimony that she had to change positions occasionally to alleviate her pain. Jones invites us to reweigh the evidence and arrive at a different conclusion, namely that her limited ability to do housework confirms her allegation of disabling pain. We cannot, however, substitute our judgment for the ALJ's when

considering the weight of the evidence, and Jones must do more than point to a different conclusion that the ALJ could have reached to demonstrate that the credibility determination was patently wrong. *Ketelboener v. Astrue*, 550 F.3d 620, 624 (7th Cir. 2008).

Jones's final two arguments merit little discussion. She suggests that in making a credibility determination the ALJ focused solely on a 2003 MRI and did not discuss a 2006 MRI. The ALJ need not, however, discuss every piece of evidence in the record and is prohibited only from ignoring an entire line of evidence that supports a finding of disability. *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009). The 2006 MRI does reveal some additional degenerative change in Jones's condition. In addition to the mild L4-L5 disk bulge that the 2003 MRI revealed, the 2006 MRI revealed degenerative change to the L3-L4 disk. Both Drs. Joseph and Lee, who reviewed the 2006 MRI, described the degenerative change as mild. Quite simply, the ALJ did not ignore an entire line of evidence that supported a finding of disability and her failure to discuss the 2006 MRI matters little in light of Jones's treating physicians' consistent description of her condition as mild or benign.

Jones also suggests that the ALJ erred in giving weight to Jones's decision to forgo surgery. This argument misrepresents the ALJ's opinion. The ALJ did not place any weight on Jones's decision to forgo surgery. Rather, the ALJ observed that Jones's treating physician recommended non-surgical alternatives and inferred from that recommendation that her condition was not as severe as she claimed.

Given the consistent objective medical opinion from both Jones's treating physicians and the agency physicians that her condition was benign, we cannot say that the ALJ's determination that Jones exaggerated her allegations of disabling pain was patently wrong. Substantial evidence supports the ALJ's decision. We affirm.