In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-3359

CAROL BATES,

*Plaintiff-Appellant*,

*v.*

CAROLYN W. COLVIN, ACTING COM-
MISSIONER OF SOCIAL SECURITY,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Indiana, Hammond Division.
No. 12:11-cv-00361— **William C. Lee**, *Judge.*

ARGUED SEPTEMBER 26, 2013 — DECIDED DECEMBER 2, 2013

Before POSNER, MANION, and KANNE, *Circuit Judges.*

KANNE, *Circuit Judge.* Carol Bates has suffered from
radiating neck pain since 2004, when a truck struck her car
from behind. In the intervening years, she has continued to
care for her six adopted children, and dealt with the loss of her
fiancé and mother. These physical and personal stresses have
taken their toll, leading Bates to seek psychological and
psychiatric treatment.

Because of her mental and physical impairments, Bates sought Supplemental Security Income ("SSI"). After her initial application was denied, Bates requested a hearing before an Administrative Law Judge. The ALJ denied her application, and the district court affirmed. Because we find the ALJ improperly discounted the opinion of Bates's treating psychiatrist and improperly evaluated Bates's testimony concerning her mental health, we reverse the decision of the district court and remand for rehearing.

## I. BACKGROUND

The proceedings underlying this appeal began in April 2007, when Bates submitted her initial SSI application. During the intervening six years, she has worked her way through the application and appeals process, which eventually brought her before this court.

### A. Bates's Initial Application

In her initial application, Bates detailed the pain that had plagued her since the 2004 car accident. She stated that her herniated disc, spine problems, and arthritis left her in constant pain. At that time, she had not seen a doctor for emotional or mental problems that would have affected her ability to work. In an accompanying questionnaire, she explained that she could prepare a very simple meal, but that she did so rarely and that when she did her sons would open jars for her and she would rip packages open with her teeth. She further stated that while she could dress herself, she would often have her son tie her shoes. And she did not carry trash or grocery bags, or laundry baskets, because of pain in her arms. Her six adopted children would help her with household chores. Bates

did not include any information about mental or psychological limitations.

Bates also underwent a consultative examination as part of the application process in August 2007. The examining physician, Dr. Stanley Rabinowitz, described Bates as "basically at home" because she had been told not to drive and could no longer play golf or tennis. He reported that Bates said she lifted nothing heavier than two or three pounds, that she occasionally cooked, and that her daughter helped with shopping and cleaning. Dr. Rabinowitz also noted that Bates could walk "perhaps a mile" in the morning and again in the evening and tried to do so for physical activity. Upon examination, he found no evidence of joint inflammation or paravertebral muscle spasm and described Bates's range of motion as within normal limits. Bates had no trouble getting on and off the examining table and could squat with moderate difficulty.

A consultative physician, Dr. Frank Jimenez, then reviewed Bates's medical records and filled out a Residual Functional Capacity ("RFC") assessment form. He did not personally examine Bates. After reviewing the records, he opined that Bates could occasionally lift and/or carry twenty pounds, and could stand or sit for six hours each in an eight-hour work day. He acknowledged that straightening of her cervical spine suggested muscle spasm, but found only one postural limitation: she could only occasionally climb ladders, ropes, or scaffolds.

*B. Bates's Medical Records*

Bates's submitted records stretch from 2004, when the pain in her neck began, to late 2009.[1] Although her first MRI found multiple levels of disc protrusion, it found no flattening of the cervical cord or significant spinal stenosis. A second MRI in February 2006 demonstrated that her condition had worsened; at this time, she had disc herniation and borderline central canal stenosis. Her then-primary care physician, Dr. Debra Killingsworth, diagnosed her with cervical radiculopathy, a condition that refers to diseased nerve roots in the neck. *Radiculopathy*, *Dorland's Illustrated Medical Dictionary* (32d ed. 2012). At several times, Bates reported having pain that was a ten on a scale from one to ten. Dr. Killingsworth referred her to a pain management clinic where she received a cervical epidural shot that helped with the pain for about nine days. Additional shots were abandoned because Bates had some paralysis on her right side after the shot. In 2007, Bates began using a TENS unit.[2] This provided some relief, although Bates continued to complain about her chronic pain. Over the next two years, she visited Dr. Katrina Cordero, her new primary care physician, a number of times for pain treatment. In December 2008, Dr. Cordero noted that Bates's pain was relatively well-controlled, but the pain returned in earnest

---

[1] Bates's initial application was filed in 2007; she supplemented the record prior to her April 2010 hearing before the ALJ with medical records that extended to December 2009.

[2] TENS stands for "transcutaneous electrical nerve stimulation." A TENS unit provides nerve stimulation intended to reduce pain.

throughout 2009. At times, Bates said the pain radiated all the way down to her ankles.

Bates's medical records also reference a right volar wrist ganglion, which she first sought treatment for in 2008. Although surgery was recommended, she never followed through.

During the time period covered by the records, Bates also suffered several significant personal losses. Her fiancé and mother died in 2006 and 2009, respectively. After both losses, Bates's primary care physicians noted that she was depressed and recommended that she seek therapy. Both times, she did. After her mother's death, she also saw a psychiatrist, Dr. Christopher Shahzaad, who began working with Bates on her anger. Over the course of four months, Dr. Shahzaad saw Bates four times, eventually diagnosing her with Bipolar Type 2 in December 2009. At this time, the medication appeared to be helping: both Dr. Shahzaad and Bates's therapist noted that Bates was feeling more in control of her anger.

*C. The Hearing*

After Bates's initial SSI application and request for reconsideration were denied, she sought a hearing before an ALJ. The hearing took place via videoconference on April 6, 2010. Bates argued that her cervical radiculopathy, a cyst in her right hand, and psychological condition made it difficult for her to sustain employment.

Bates testified that sometimes the pain was so bad she would just take her medicine and lie down, because she couldn't stand to do anything else. The pain kept her from

attending her adopted children's baseball and basketball games, and prevented her from walking more than two blocks. Bates said she did no housework. She estimated that she could stand for about forty-five minutes at a time, and that she could sit for twenty to forty-five minutes. After that period of time, she would have to take some medication and lay down. In a typical day, she would have to lie down five or six times. She would also use her TENS unit for forty-five minutes about three times a day.

When asked about the cyst on her hand, Bates described it as painful and stated that she could not write for more than ten or twenty minutes without pain. She stated that she could have it excised but that she did not have the necessary transportation to take her to and from the doctor's office.

Bates said she had trouble concentrating and would get frustrated while reading or even while listening to jazz, which she used to enjoy. When asked if she got along with other people, Bates responded that she would have trouble talking to them for a long period of time because they would start aggravating her. And she often avoided going out in public because she knew she was going to get in a confrontation with someone that she would feel guilty for later.

After the hearing, the ALJ issued an opinion denying Bates's request for SSI. She gave significant weight to the opinion of the consultative physician, Dr. Jimenez. The ALJ discredited the opinions from Bates's treating physicians, which she found inconsistent with the other medical record. She found Dr. Cordero's description of Bates's capabilities incredible because the preponderance of the evidence in

Bates's record showed normal muscle strength, normal ambulation, and no muscle spasm. Dr. Shahzaad's opinion was discredited because he had been treating Bates for only 3 months and noted "fair" ability in most areas. The ALJ found Dr. Jimenez's opinion, rather than the Shahzaad and Cordero opinions, to be consistent with the majority of the evidence in the record.

She also discredited Bates's testimony with regard to disability because of depression and pain. Specifically, the ALJ noted several discrepancies in Bates's testimony: although she said at the hearing she could walk only 1-2 blocks, she reported at the consultative examination she could walk a mile in the morning and a mile in the afternoon; she had previously reported that she cooked, but at the hearing said she did no household chores; there is no indication her doctors told her not to exercise, nor any medical signs and findings that would prove her limitations as severe as alleged. The ALJ also pointed out that her treatment has been routine and conservative, and that Bates missed several doctors' appointments in 2008.

As a result, the ALJ found Bates capable of performing "light work." Light work includes the ability to occasionally climb ladders, ropes, or scaffolds; to understand, remember, and carry out simple, routine tasks; to concentrate, persist, and work on a sustained basis; to interact appropriately with others; and to tolerate ordinary job routines and changes. Because there were a significant number of jobs in the national economy that Bates could perform, the ALJ held that Bates was not disabled.

The Appeals Council denied review, at which point the ALJ's decision became the final decision of the Commissioner, subject to judicial review. 20 C.F.R. §§ 416.1455, 416.1481. Bates then appealed the ALJ's decision to the district court, which affirmed. The district court found that the ALJ adequately considered Dr. Cordero's opinion and reasonably rejected it because the extreme limitations Dr. Cordero noted were not supported by the objective medical evidence. With regard to Dr. Shahzaad, the court found his opinion was also properly discounted because Dr. Shahzaad's treatment notes documented an improvement in Bates's condition. The district court further found that the hypotheticals the ALJ posted to the vocational experts were entirely consistent with the ALJ's RFC finding. Finally, the district court upheld the ALJ's finding that Bates was not credible. It stated that Bates failed to identify a ground on which the district court could find that the ALJ's determination was "patently wrong."

Bates now seeks appellate review, claiming that the ALJ did not properly evaluate the opinions of her treating sources, that the ALJ did not properly evaluate her credibility, and that the ALJ did not properly account for Bates's deficiencies in concentration, persistence, or pace or social functioning.

## II. ANALYSIS

When reviewing a denial of disability benefits, we review the district court's judgment affirming the Commissioner's decision *de novo*. *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010). We will uphold the Commissioner's final decision if the ALJ applied the correct legal standards and supported her decision with substantial evidence. 42 U.S.C. § 405(g); *Jelinek v.*

*Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007).

*A. The ALJ's Credibility Determination*

An ALJ's credibility determination is entitled to deference, and we will overturn a credibility finding only if it is "patently wrong." *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013). We are not allowed to reweigh the facts or reconsider the evidence. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). But when a credibility finding rests on "objective factors or fundamental implausibilities," rather than on a claimant's demeanor or other subjective factors, we have greater leeway to evaluate the ALJ's determination. *Schomas v. Colvin*, 732 F.3d 702, 708 (7th Cir. 2013).

The ALJ found Bates's testimony incredible, both as it related to the extent of her pain and the effects of her psychological condition. Both determinations suffer from objective flaws, but only the credibility determination as to Bates's psychological symptoms merits remand.

*1. The ALJ improperly discredited Bates's testimony concerning the effects of her chronic pain.*

The ALJ found Bates's testimony regarding the extent of her pain incredible, observing that Bates missed several doctors appointments in 2008, that Bates's condition improved over time, that Bates's reports of her daily activities were inconsistent, that treatment notes contradicted what Bates said her doctors told her, that her treatment was routine and

conservative, that she did not appear to be in pain during the hearing, and that the objective medical record did not support Bates's allegations of severe pain.

Not all of these reasons are legitimate. For instance, an ALJ must inquire as to why a claimant missed an appointment before drawing a negative inference from her failure to attend. *See Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012). And the ALJ stated that there was no evidence surgery was ever recommended to Bates, despite a discussion of surgery in notes from a visit to a neurosurgeon in June 2008.

But the standard of review employed for credibility determinations is extremely deferential, and the ALJ did provide some evidence supporting her determination. She noted that Bates initially reported that she did some cooking but at the hearing testified that she did no household chores. And she noted that Bates did not engage in any overt pain behavior during the hearing. Even such a minor discrepancy, coupled with the hearing officer's observations of a claimant during the hearing, is sufficient to support an ALJ's finding that a claimant was incredible. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2001) (holding that the hearing officer's evaluation of mildly inconsistent testimony, coupled with his observations of the claimant at trial, is sufficient to avoid remand under the "patently wrong" standard). Thus, we cannot find that the ALJ's credibility determination was "patently wrong."

Bates also contends that the ALJ ignored limitations caused by the ganglion cyst on her right hand and the side effects of her medications. But these limitations had little support in the record; what did appear in the record did not support limita-

tions so extreme as to establish a disability. The ALJ's failure to discuss them was thus not in error. *See Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010) (ALJ did not err in ignoring a line of evidence that did not suggest a disability).

*2. The ALJ improperly found Bates incredible with respect to the impact of her mental health*

The ALJ further found that Bates's allegations of disability because of depression were not fully credible. As noted above, an ALJ's credibility finding is typically entitled to substantial deference, unless it rests on objective factors that appellate courts can reliably review. *Schomas*, 732 F.3d at 708.

To support her finding, the ALJ listed a number of statements from Bates's medical records and concluded that her mental findings were "essentially normal and intact." But these statements were cherry-picked from the record, selected without consideration of the context in which they appear. An ALJ cannot rely only on the evidence that supports her opinion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). And while an ALJ need not mention every piece of evidence in her opinion, she cannot ignore a line of evidence that suggests a disability. *Jones*, 623 F.3d at 1162. For example, the ALJ's opinion states that treatment notes from an August 12, 2009 appointment show "relevant thought process." The rest of the notes from that session, however, show that Bates was tearful, anxious and isolated, suffering from insomnia, depressed, and had a constricted affect. Similarly, the opinion notes that on June 25, 2009, Bates had "linear and logical thought process and fair insight and judgment." The notes from that session also state that Bates was suffering from mood swings, was

extremely sad, had suicidal ideation about a month prior, and had a global assessment of functioning (GAF) score of 42.[3] And on the date that the ALJ noted that Bates had "fair" abilities, her concentration was poor, she was struggling with anger issues, and Dr. Shahzaad started to consider whether Bates was suffering from bipolar disorder. He later diagnosed her with bipolar disorder type II. These findings are not "essentially normal," but reveal a claimant struggling with serious mental health issues.

*B. Bates's Treating Physicians*

Bates's record contained opinions from two treating physicians, Dr. Cordero and Dr. Shahzaad. Dr. Cordero opined as to Bates's physical limitations and Dr. Shahzaad described her psychological limitations. The ALJ discounted both opinions in favor of the opinion of the consultative physician, Dr. Jimenez. Bates argues that this evaluation was in error.

---

[3] The GAF score reflects both severity of symptoms and functional level. *Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed. text revision 2000)**.** A score of 42 reflects serious symptoms or any serious impairment in social, occupational, or school functioning. While the American Psychiatric Association has since discontinued this metric, *Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders* 16 (5th ed. 2013), the GAF score was still in use at the time Shahzaad examined Bates.

We recognize that a low GAF score alone is insufficient to overturn an ALJ's finding of no disability. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). In this case, however, taking the GAF scores in context helps reveal the ALJ's insufficient consideration of all the evidence Bates presented.

A treating physician's opinion is entitled to controlling weight if it is supported by medical findings and consistent with substantial evidence in the record. *Elder*, 529 F.3d at 415. If this opinion "is well supported and there is no contradictory evidence, there is no basis on which the administrative judge, who is not a physician, could refuse to accept it." *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) (*quoting Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006)). But "once well-supported contradicting evidence is introduced, the treating physician's evidence is no longer entitled to controlling weight" and becomes just one more piece of evidence for the ALJ to consider. *Id.* Thus, to the extent a treating physician's opinion is consistent with the relevant treatment notes and the claimant's testimony, it should form the basis for the ALJ's determination.[4]

*1. Dr. Cordero*

While Dr. Cordero thought Bates could sit for only two hours total during a work day, Dr. Jimenez, the consultative

---

[4] We note here that the "treating physician rule" does not apply to RFC determinations by physicians; the extent of what a claimant can do despite her limitations is committed to the exclusive discretion of the ALJ. 20 C.F.R. § 404.1545(a)(1) (defining RFC); 20 C.F.R § 404.1527(d) (the final responsibility for determining your RFC is reserved to the commissioner). That being said, statements within a document labeled as an RFC that do not state what a claimant can or cannot do in a given day constitute a treating physician's opinion to which the ALJ must defer. *See* 20 C.F.R. § 404.1527(a)(2) (defining medical opinions). And although the ALJ need not defer to a doctor's opinion about a claimant's ability to work, it still cannot ignore the doctor's opinion when determining a claimant's RFC. *Roddy v. Astrue*, 705 F.3d 631, 638 (7th Cir. 2013).

physician, thought she could do so for six hours total. Dr.
Cordero also said Bates would have to change positions
frequently, while Dr. Jimenez left unchecked a box stating that
the claimant must alternate sitting and standing to alleviate
discomfort. In resolving this conflict, the ALJ credited Dr.
Jimenez's opinion, stating that it was consistent with the
objective medical evidence, which showed normal muscle
strength and ambulation and included no evidence of muscle
spasm.

The doctors' reports primarily differ as to their descriptions
of Bates's pain, a question that depends on their interpretation
of Bates's subjective complaints. And where a treating physi-
cian's opinion is based on the claimant's subjective complaints,
the ALJ may discount it. *Ketelboeter v. Astrue*, 550 F.3d 620, 625
(7th Cir. 2008). The question of which physician's report to
credit thus collapses into the credibility issue; because the ALJ
found that Bates was not credible in her reports of pain, she
also gave Dr. Cordero's opinion, which relied heavily on these
reports, little weight. *Cf. Schaaf v. Astrue*, 602 F.3d 869, 876 (7th
Cir. 2010) (ALJ gave little weight to treating physician's
opinion because he also discredited claimant's testimony).
Because we find that the ALJ's credibility determination with
respect to pain was not patently wrong, her assessment of Dr.
Cordero's opinion is also not in error.

### 2. Dr. Shahzaad

In this case, the only evidence in the record concerning
Bates's psychological difficulties were the treatment notes of
her therapist, the treatment notes of Dr. Shahzaad, Dr.
Shahzaad's opinion, and the testimony of Bates herself. Dr.

Rabinowitz did not do a full psychological assessment,[5] and Dr. Jimenez filled out a physical RFC form, not a mental one.

Dr. Shahzaad opined that Bates had mood disturbances, difficulty thinking or concentrating, social withdrawal or isolation, and decreased energy. He explained that she had difficulty dealing with depression and was easily frustrated with others. He also estimated that she had a present GAF score of 50, and that her highest GAF score within the past year was a 55. His treatment notes indicate a diagnosis of bipolar type 2 disorder. The therapist's notes track Dr. Shahzaad's neatly, frequently noting a flat affect and depressed mood. At one appointment, the therapist found that Bates was angry and dysphoric, and in an irritable mood. Bates's own testimony corroborates these findings. She stated that she was frequently angry with others, and that she struggled to concentrate on activities she previously enjoyed, like reading and listening to jazz. Bates's primary care physicians also frequently noted that Bates was depressed.

---

[5] Dr. Rabinowitz's notes do include a section titled "Mental Status Examination." At the time, however, Bates had not been diagnosed with bipolar disorder or depression, and Bates's chief complaint was cervical spine pain. Dr. Rabinowitz's mental status notes focus on memory and outward behavior and conclude with the statement that Bates "would appear to be able to handle their own funds." This statement thus does not contradict Dr. Shahzaad's opinion; Dr. Jimenez was looking primarily for physical limitations. There was no opinion, other than Dr. Shahzaad's, that provided a comprehensive view of Bates's depression and bipolar disorder. *Cf. Jelinek*, 662 F.3d at 812. Further, the ALJ did not rely on Dr. Jimenez's opinion in rejecting Dr. Shahzaad's opinion; thus, we cannot affirm the ALJ's determination on this ground. *See id.* (*citing Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010)).

The ALJ, however, gave little weight to Dr. Shahzaad's opinion, stating that "Dr. Shahzaad had been treating the claimant for only 3 months and noted fair ability in most areas." Neither of these are the "good reasons" an ALJ must provide in order to discount a treating physician's opinion. *See Martinez v. Astrue*, 630 F.3d 693, 698 (7th Cir. 2011). While length of the treatment relationship is relevant for evaluating how much weight to accord a treating physician's evaluation, *see* 20 C.F.R. § 1527(c)(2)(I), in this case there was no other medical opinion for the ALJ to fall upon. The state agency examining and consultative physicians did not examine Bates for psychological illness; at the time they reviewed her record, Bates had only seen a therapist briefly after the death of her fiancé. While Bates did bear the burden of producing evidence of her impairments, if the ALJ thought this evidence insufficient—as she apparently did—it was her responsibility to recognize the need for additional evaluations. *Scott v. Astrue*, 647 F.3d 734, 741 (7th Cir. 2011).

Moreover, the fact that Dr. Shahzaad noted fair ability in most areas does not qualify as a good reason for discounting his opinion. It is unclear from the ALJ's opinion what she meant by this statement. The statement could be interpreted to mean that she thought Dr. Shahzaad's estimations were overly skeptical of Bates's ability to work. Alternately, it could mean that she thought a "fair" prognosis meant Bates's mental problems did not really affect her ability to work. Without knowing what the ALJ meant by this statement, we cannot affirm on this ground. *See Roddy*, 705 F.3d at 637; *see also Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002) (where opinion is

"so poorly articulated as to prevent meaningful review," case must be remanded).[6]

### III. CONCLUSION

Because the ALJ improperly discredited Bates's testimony considering the limitations caused by her mental illness and failed to grant Dr. Shahzaad's medical opinion the weight it deserved under the treating physician rule, we REVERSE the decision of the district court and REMAND for proceedings consistent with this opinion.

---

[6] Bates also argues that under *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618–19 (7th Cir. 2010), her case should be remanded because the ALJ did not include deficiencies in concentration, persistence, and pace in her final RFC. That case, however, dealt with whether the ALJ had posed appropriate hypotheticals to the vocational expert—not whether the ALJ's RFC determination was correct. *Id.* Thus, this argument is essentially a challenge to the ALJ's RFC determination, which, as explained above, must be reconsidered on remand.