NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued June 8, 2016
Decided July 5, 2016

**Before**

WILLIAM J. BAUER, Circuit Judge

DANIEL A. MANION, Circuit Judge

MICHAEL S. KANNE, Circuit Judge

No. 15-2992

| | |
|---|---|
| RICHARD S. AURAND, | Appeal from the United States District |
| *Plaintiff-Appellant*, | Court for the Northern District of Illinois, Eastern Division. |
| *v.* | |
| | No. 14 C 3986 |
| CAROLYN W. COLVIN, | |
| Acting Commissioner of Social Security, | Sidney I. Schenkier, |
| *Defendant-Appellee*. | *Magistrate Judge*. |

**ORDER**

Richard Aurand applied for Disability Insurance Benefits and Supplemental Security Income claiming disability from mental illness and scarring from burns suffered during a suicide attempt. An administrative law judge denied benefits, and the Appeals Council and district court upheld that decision. The ALJ discounted the opinions of the two examining mental-health experts and concluded that Aurand was exaggerating the extent of his mental and physical limitations. On that basis the ALJ found that Aurand is able to perform unskilled, light work with restrictions. Because this finding is not supported by substantial evidence, we overturn the ALJ's decision and remand for further proceedings.

Aurand applied for benefits in December 2011, when he was 50 years old, and alleged an onset date in February 2011. His date last insured was in December 2012. Aurand asserted that he suffers from bipolar disorder and cannot work because of that impairment and the scar tissue resulting from burns on his face, ears, neck, back, chest, and hands. Aurand had worked for 23 years as a millwright and machinist until he left his job in 2007 to care for his father. The Social Security Administration denied Aurand's applications initially in March 2012 and again on reconsideration in July 2012. His hearing before the ALJ was in November 2012.

Aurand's suicide attempt occurred in 2009 after the death of his father. While drunk he had doused himself with gasoline and lit a match. He suffered third-degree burns over 30% of his body and went through debridement (removal of damaged tissue) and several skin grafts. There are no medical records showing what, if any, treatment he received for pain or other limitations resulting from the remaining scar tissue after the initial graft recovery period.

In October 2011, approximately two months before Aurand's current applications for DIB and SSI were filed, psychiatrist Sudhir Gokhale diagnosed him with bipolar disorder and prescribed oxcarbazepine (Trileptal).[1]  A few weeks later, Dr. Gokhale completed a form assessing Aurand's ability to work. Dr. Gokhale rated Aurand fair to poor on all of the form's measures of cognitive workplace skills, assessed a GAF score of 50,[2]  and noted his diagnosis of "recurring bipolar disorder." Dr. Gokhale then treated

---

[1]  Trileptal is an anticonvulsant sometimes used to treat bipolar disorder. *See Oxcarbazepine (Trileptal)*, NATIONAL ALLIANCE ON MENTAL ILLNESS, https://www.nami.org/Learn-More/Treatment/Mental-Health-Medications/Oxcarbazepine-%28Trileptal%29 (visited June 30, 2016).

[2]  The GAF, or Global Assessment of Functioning, allows a clinician to asses a patient's symptom severity or level of functioning on a scale of 0 to 100, with a score of 91 or higher optimal. AM. PSYCHIATRIC ASS'N, DIAGNOSTIC & STATISTICALMANUAL OF MENTAL DISORDERS, 32–33 (4th ed., Text Rev. 2000). A GAF score of 41 to 50 reflects "serious symptoms . . . or serious difficulty in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.* at 32–34. A GAF score of 31 to 40 reflects "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school,

Aurand at least twice more, once later in November 2011 and then in January 2012, when he prescribed mirtazapine in addition to the oxcarbazepine.[3]

In February 2012, clinical psychologist Christine Kieffer performed a psychological consultative exam at the request of the state agency. Dr. Kieffer recounted Aurand's report of his symptoms and noted Aurand's statement that he had been diagnosed with bipolar disorder and was taking mirtazapine prescribed by a psychiatrist he was seeing monthly. Dr. Kieffer found Aurand's capacities for attention and concentration to be "markedly impaired," reported that he could not add, subtract, or multiply, and assessed a GAF score of 40.

Later that same day an internist, Dr. Liana G. Palacci, performed an internal medicine consultative exam at the request of the state agency. Dr. Palacci recorded Aurand's complaints of tightness and decreased sensation at the site of his skin grafts but noted that he could hold coins, turn doorknobs, button shirts, and tie shoelaces. She found normal grip and upper extremity strength but reduced range of motion in his shoulders and neck. She also reported, in contrast with Dr. Kieffer, that Aurand *could* do simple arithmetic.

In March 2012 a state-agency physician completed a "physical residual functional capacity assessment." Relying on Dr. Palacci's findings, the reviewing doctor concluded that Aurand's ability to reach was limited, though he could fully perform tasks involving handling, fingering, and feeling. The reviewing doctor also imposed moderate limitations on lifting, standing, sitting, kneeling, crouching, and crawling, and found that Aurand should never climb ladders, ropes, or scaffolding.

Also in March 2012, state-agency psychiatrist Glen Pittman completed a "rating of functional psychiatric limitations" and a "mental residual functional capacity assessment." Dr. Pittman opined that Aurand had moderate degrees of limitation in concentration, pace, and persistence; social functioning; daily activities; and ability to

---

family relations, judgment, thinking, or mood (e.g., depressed adult avoids friends, neglects family, and is unable to work)." *Id.*

[3] Mirtazepine is an anti-depressant sometimes used to treat bipolar disorder. *See Medications*, INTERNATIONAL BIPOLAR FOUNDATION, http://ibpf.org/medications (visited June 30, 2016).

understand and remember detailed instructions, among others. Dr. Pittman acknowledged the diagnosis of bipolar disorder but nonetheless remarked that the clinical evidence does not support the presence of a "formal thought disorder." He did not explain this comment or say how it relates to Aurand's diagnosis. Dr. Pittman downplayed that diagnosis by asserting that Dr. Gokhale "apparently" had based it on a single statement from Aurand about experiencing high and low moods. Dr. Pittman also asserted that Aurand was being treated successfully with low doses of a "2nd tier antidepressant," which is "not at all typical of what is considered standard treatment for bipolar." Dr. Pittman concluded that Aurand's mental impairment did not satisfy any listing for a presumptive disability and that Aurand was capable of performing simple, unskilled work.

In April 2012, about a month after the SSA initially had denied benefits, Aurand severed the tip of a finger on his left hand while repairing a tractor. In July, after receiving medical records relating to this incident, a second state-agency physician performed an updated "physical residual functional capacity assessment." She found reduced range of motion and sensation in the tip of the finger that had been injured, though she found no significant limitations. Also in July, a second state-agency psychologist reviewed the medical records and agreed with Dr. Pittman's psychological assessment. The SSA then denied benefits on reconsideration.

At the hearing before the ALJ in November 2012, Aurand recounted that his activities of daily living are quite limited because of his mental illness and the continuing pain from his skin grafts. He explained that he can't turn his neck or look up because of the scar tissue and also has reduced sensation on the finger that was injured. He testified that he can walk only a block before growing tired, can sit for no more than two hours, and can stand for only one hour, all because of generalized pain from his scar tissue. He asserted that he can concentrate only for an hour or two before dozing off. He lives with his stepmother but said he does not help with household chores and spends his days in bed watching TV because of his depression and pain. He explained that most days his only physical activity is going to his sister's house to watch his nine-year-old nephew for two hours while his sister works. He said that usually his stepmother drives him, but occasionally he walks the block to his sister's house if he feels up to it. Aurand testified that he does not leave his home to shop or for fun and does not make repairs around the house, do laundry, or mow the lawn. When asked if he had "attempted to work" during the last couple years, Aurand answered that he had tried to get a temporary job but couldn't pass a physical. When asked how he had injured his finger, he first said that he severed it trying to pick up a steel plate from his stepmother's lawn, but when pressed

about statements found in the medical records regarding that injury, Aurand admitted that actually he had injured the finger while working on a tractor in Indiana. He reported that his only ongoing medical treatment was visits to a doctor, whose name he could not remember, every couple months for depression (neither his counsel nor the ALJ asked whether this was Dr. Gokhale or inquired any further). The only prescription medication he was taking was half a pill of "Nasapene" before bed to help him sleep. He mentioned he also took two Tylenol a day, which "somewhat" controls the pain in his injured finger.

Aurand's stepmother also testified, and her testimony was in many ways inconsistent with Aurand's. She reported that she rarely drives Aurand to his sister's house because he prefers to walk and that when at his sister's he "putzes in the garage," cleans the garage, and rakes the leaves. She said that once he had left his nephew alone to go to the store to buy pizza. She explained that at home Aurand does not do much but will wash the dishes and occasionally do laundry. She mentioned that in the summer of 2012 he had worked full-time for about two months before being laid off and was continuing to seek work.

Aurand was recalled after his stepmother's testimony and asked about the 2012 job she had mentioned. He explained that he had worked full-time as a machinist for about two months but was fired without explanation, probably, he guessed, for making mistakes. He did not say that he was unable to perform parts of the job, experienced pain doing the job, or missed any days of work.

A vocational expert also testified. He said that Aurand could not perform his past work with the residual functional capacity described by the ALJ. The vocational expert opined, however, that Aurand could work as a hand packer, assembler, or hand sorter unless he was unable to frequently feel and finger with both hands. The vocational expert acknowledged, though, that Aurand would be unemployable if he was off task more than 15% of the workday.

The ALJ applied the 5-step analysis for assessing disability, *see* 20 C.F.R. §§ 404.1520(a), 416.920(a), and concluded that Aurand was not disabled. At Step 1 the ALJ determined that Aurand had not engaged in substantial gainful activity since his alleged onset in February 2011. At Step 2 the ALJ identified Aurand's severe impairments as "status post burn injury, status post skin grafts, bipolar disorder, and history of substance abuse." Aurand does not dispute these conclusions.

At Step 3 the ALJ concluded that these impairments, individually or in combination, do not satisfy a listing for presumptive disability. The ALJ noted that she had paid particular attention to listings for burn injuries and mental disorders, but that the severity of Aurand's impairments does not meet the criteria of these listings.

At Step 4, in determining Aurand's residual functional capacity, the ALJ rejected Aurand's account of disabling limitations. Oddly, she first noted that Aurand had stopped working to care for his father, not because of his impairments, even though that event occurred years before his alleged onset date. The ALJ then emphasized that Aurand had worked after his onset date and apparently, she asserted, had been laid off rather than fired for cause. She highlighted several inconsistencies in Aurand's testimony, including his changing stories about how he injured his finger and his representation—exposed as false by his stepmother—that he had not worked after his father's death. The ALJ also compared Aurand's testimony that he does nothing but stay home watching TV unless babysitting his nephew with his stepmother's testimony that he sometimes washes dishes, does laundry, shops for food, rakes his sister's leaves, and cleans her garage.

In assessing Aurand's residual functional capacity, the ALJ discounted Drs. Gokhale and Kieffer's opinions about Aurand's psychological limitations. The ALJ reasoned that Dr. Gokhale was not a treating source. Although he eventually saw Aurand at least twice more, Dr. Gokhale had seen Aurand only once when he completed the form, which the ALJ characterized as conclusory and lacking support in the doctor's notes, which, according to the ALJ, include only Aurand's "subjective complaints." Similarly, the ALJ reasoned that Dr. Kieffer's opinion after the consultative psychological exam rests entirely on the "claimant's own statements during the interview." The ALJ also pointed out that Aurand had performed simple arithmetic for the internist, even though he could not for Dr. Kieffer. The ALJ instead gave great weight to the assessment of Aurand's mental residual functional capacity made by state-agency reviewing psychiatrist Glen Pittman. The ALJ, despite finding at Step 2 that Aurand suffers from bipolar disorder that is severe, purported to endorse Dr. Pittman's reasoning that that Aurand does not even suffer from a "formal thought disorder." The ALJ also characterized Dr. Pittman's assessment as more in line with the testimony regarding Aurand's activities and limited treatment. Finally, the ALJ gave great weight to the state-agency doctors' assessments of Aurand's physical residual functional capacity. Those assessments, the ALJ opined, were supported by Aurand's activities, treatments, examinations, and recent work history.

The ALJ decided that Aurand could not perform his past relevant work but could perform light work with certain physical and mental limitations. At Step 5 she concluded that Aurand could work as a hand packer, assembler, or hand sorter.

Because the Appeals Council denied review, we evaluate the ALJ's decision as the final word of the Commissioner. *Scrogham v. Colvin*, 765 F.3d 685, 695 (7th Cir. 2014). In this court Aurand makes a number of arguments, but the most significant is that when assessing his residual functional capacity the ALJ failed to adequately support her decision to disregard the opinions of the two examining mental-health experts, Drs. Gokhale and Kieffer, in favor of the non-examining state-agency consultant, Dr. Pittman. Moreover, he contends that the ALJ was required to give controlling weight to the opinion of Dr. Gokhale, who Aurand insists is a treating source.

We doubt that Dr. Gokhale was a treating source when he submitted his report in November 2011, since at that time he had met with Aurand only once. *See* 20 C.F.R. § 404.1502; *Simila v. Astrue*, 573 F.3d 503, 514 (7th Cir. 2009) (concluding that doctor who met with claimant only once, for purpose of obtaining report in support of claimant's disability application, and lacked ongoing relationship with claimant, was not treating source); *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) (explaining that doctor who examined claimant only once before completing report was not a treating source despite making diagnosis and prescribing medication); *cf. Meyer v. Astrue,* 662F.3d 700, 702, 705 n.1 (4th Cir. 2011) (concluding that doctor who was not providing care at time he wrote report for claimant but who had been treating physician some years *before* writing report was a treating source). But the Commissioner does not explain why, nor cite any cases explaining why, Dr. Gokhale could not have become a treating source *after* submitting the report. Dr. Gokhale saw Aurand at least twice more for follow-up care and adjusted Aurand's medication, prescribing a second drug used to treat bipolar disorder. (It seems likely that Dr. Gokhale was providing the ongoing psychological care mentioned to Dr. Kieffer and again during Aurand's testimony, a question that the claimant's lawyer and the ALJ could have clarified at the hearing but did not.) And after Dr. Gokhale had seen Aurand for follow-up visits, the psychiatrist never revised or withdrew his initial opinion.

In any event, the problem is that the ALJ has not pointed to any logical reason to discount the opinions of the only examining mental-health professionals, one of whom was the state agency's own consultative examiner, in favor of a non-examining reviewer. "Rejecting or discounting the opinion of the agency's own examining physician that the claimant is disabled, as happened here, can be expected to cause a reviewing court to

take notice and await a good explanation for this unusual step." *Beardsley v. Colvin*, 758 F.3d 834, 839 (7th Cir. 2014); *see* 20 C.F.R. §§ 404.1527(c)(1), 416.927(c)(1) ("Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you."); *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003) ("An ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice."); *Sharfarz v. Bowen*, 825 F.2d 278, 280 (11th Cir. 1987) (same); *Havas v. Bowen*, 804 F.2d 783, 786 (2d Cir. 1986) (same).

Dr. Gokhale and Dr. Kieffer, the only two mental-health experts to examine Aurand, both opined in reports that are largely consistent that Aurand has severe mental limitations. In discounting the opinions of Drs. Gokhale and Kieffer, the ALJ reasoned that both doctors essentially relied on Aurand's own "subjective complaints" and statements. But a psychological assessment is by necessity based on the patient's report of symptoms and responses to questioning; there is no blood test for bipolar disorder.[4] The Commissioner cites cases in which ALJs discounted medical opinions resting entirely on subjective complaints of pain that could not be explained by the objective medical evidence. *See Bates v. Colvin*, 736 F.3d 1093, 1100 (7th Cir. 2013); *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001). We have cautioned that even physical pain often cannot be explained through diagnostics, *see, e.g., Pierce v. Colvin*, 739 F.3d 1046, 1049–50 (7th Cir. 2014); *Sims v. Barnhart*, 442 F.3d 536, 537 (7th Cir. 2006), but for bipolar disorder there isn't "objective medical evidence" that can support a diagnosis. Thus it's illogical to dismiss the professional opinion of an examining psychiatrist or psychologist simply because that opinion draws from the claimant's reported symptoms.

Moreover, there is no reason to think that Dr. Gokhale did not also base his assessment on observation and tests of Aurand's ability to remember, concentrate, and reason, as well as Aurand's history of attempting suicide. Dr. Kieffer explicitly described

---

[4] To diagnose bipolar disorder a psychiatrist or psychologist speaks with a patient about their "thoughts, feelings, and behavior patterns" and mental-health history and compares those reported signs and symptoms with criteria in the Diagnostic and Statistical Manual of Mental Disorders. A physical exam may also be administered to rule out physical causes of the patient's reported signs and symptoms. *See, e.g.,* AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 123–27 (5th ed. 2013); *Bipolar Disorder*, MAYO CLINIC, http://www.mayoclinic.org/diseases-conditions/bipolar-disorder/basics/tests-diagnosis/con-20027544 (visited June 30, 2016).

administering such tests and concluded that Aurand's capacities for attention, concentration, and calculation were "markedly impaired" and that his "general fund of information was poor." Of course it is possible that Aurand was faking his responses to those tests, but if that risk is enough to reject a diagnosis of mental illness, then no psychological assessment ever could be a basis for awarding benefits. Plainly, a mental impairment *can* be disabling.

The ALJ's second reason for discounting Dr. Kieffer's opinion likewise is illogical. The ALJ asserted that Dr. Kieffer's opinion "is eroded" because, while Dr. Kieffer reported that Aurand was unable to perform simple arithmetic, the internist who saw him later that same day remarked that he could. But Dr. Kieffer is a psychologist who examined Aurand to assess his mental capacities; Dr. Palacci is not a mental-health expert and saw Aurand to assess his physical limitations. If Aurand was faking an inability to do simple math, would he not have been clever enough to pretend for both doctors on the same day?

The ALJ's decision to discount the opinions of the examining psychiatrist and psychologist is not saved by her reliance on the opinion of Dr. Pittman, the reviewing psychiatrist. The ALJ credited Dr. Pittman's reasoning that the symptoms Aurand reported and the medication he received are not typical of bipolar disorder. But the ALJ did not explain why Dr. Pittman, who never saw Aurand, was more qualified to assess Aurand's mental health than the professionals who did examine him. Dr. Pittman undercuts Dr. Gokhale's diagnosis of bipolar disorder by (1) remarking that Dr. Gokhale "apparently" had based his diagnosis on one statement by Aurand that he experienced high and low moods, and (2) noting that Dr. Gokhale had prescribed a drug not typically used for bipolar disorder.[5] The choice of drug, Dr. Pittman asserts, suggests that Dr. Gokhale did not consider Aurand's disorder to be severe. But again there is no reason to think that Dr. Gokhale based his diagnosis on a single statement from Aurand, instead of his own observations of Aurand's functioning in combination with Aurand's overall responses to the usual diagnostic questions about his thoughts, feelings, and

---

[5] The drug in question, mirtazapine (trade name Remeron), is sometimes prescribed for bipolar patients, *see Medications*, INTERNATIONAL BIPOLAR FOUNDATION, http://ibpf.org/medications (visited June 30, 2016), though it is typically used to treat major depressive disorder and the FDA has not approved it for use with bipolar patients, *see Remeron*, PHYSICIAN'S DESK REFERENCE, http://www.pdr.net/full-prescribing-information?druglabelid=384 (visited June 30, 2016).

behavior, and history of attempting suicide. And Dr. Pittman does not go on to say what more would have merited such a diagnosis, why the prescribed drug could not be used to treat bipolar disorder, or what Dr. Pittman's own diagnosis would be, given that Dr. Pittman did find that Aurand had bipolar disorder and some resulting mental limitations. Nor does Dr. Pittman explain why Dr. Kieffer's opinion, which corroborated Dr. Gokhale's diagnosis and assessed an even lower GAF score, should be discounted.

The reasons the ALJ gave for rejecting the opinions of the examining psychological experts are inadequate to "build an accurate and logical bridge between the evidence and the result." *Beardsley*, 758 F.3d at 837. Thus the ALJ's decision is not supported by substantial evidence. *See id.*; *Thomas v. Colvin*, 745 F.3d 802, 806 (7th Cir. 2014) (explaining that deference in review of ALJ decision is lessened when ALJ has made errors of fact or logic). Moreover, this error was compounded by the ALJ's reliance on Dr. Pittman and adversely affected the ALJ's assessment of Aurand's credibility, his psychological residual functional capacity, and the hypothetical posed to the vocational expert. We thus do not delve into Aurand's other challenges to those two determinations or to the hypothetical.

Aurand's remaining arguments are meritless. He contends that the ALJ erred at Step 3 in concluding that his impairments do not satisfy a listing for presumptive disability, arguing that the ALJ erroneously considered each of his impairments individually and did not discuss their combined effect. But the ALJ's conclusion at Step 3 is supported by substantial evidence. While the overall assessment of disability must encompass an applicant's impairments in the aggregate, *see Martinez v. Astrue*, 630 F.3d 693, 698–99 (7th Cir. 2011), at Step 3 the ALJ must consider the specific requirements for each listing. *See* 20 C.F.R. § 404.1526. Aurand did not argue before the ALJ, and his brief does not identify any evidence from which to conclude, that his limitations overlapped in a manner that met the criteria of a listed impairment. Opinions of state-agency consultants may constitute substantial evidence on the issue whether a claimant's impairments meet or medically equal any presumptive disability listing. *See Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004); *Farrell v. Sullivan*, 878 F.2d 985, 990 (7th Cir. 1989). Dr. Pittman, the state-agency psychiatrist, and two state-agency physicians assessing Aurand's physical health specifically opined that Aurand's impairments did not satisfy any listing, and no provider, not even Dr. Gokhale, contradicted this conclusion.

Aurand next argues that in assessing his physical residual functional capacity the ALJ erred by overlooking his reduced sensation in his skin grafts, reduced range of

motion of his shoulders, and reduced arm and grip strength. But the ALJ did not overlook Aurand's reports of reduced sensation and range of motion; she specifically noted them but discredited his testimony about the range of limitation they imposed. She relied on Dr. Palacci's examination showing Aurand to have normal grip strength and the absence of any complaint from Aurand about a physical problem during his two months of work in 2012. Given this evidence, the ALJ's decision to discredit Aurand's testimony regarding the limitations imposed by his skin grafts was not "patently wrong." *Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015).

Though these last two contentions are unpersuasive, Aurand is correct that the ALJ did not give a logical explanation for discounting the opinions of two examining psychological experts in favor of a non-examining consultant. This error leaves the ALJ's decision without support from substantial evidence, and accordingly we overturn the ALJ's decision and remand the case to the agency for further proceedings.