In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-1197

RANDY L. SCHOMAS,                                      *Plaintiff-Appellant,*

*v.*

CAROLYN W. COLVIN,
Acting Commissioner of
Social Security,                                      *Defendant-Appellee.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 11-1210 — **Joe Billy McDade**, *Judge.*

ARGUED AUGUST 7, 2013 — DECIDED OCTOBER 3, 2013

Before EASTERBROOK, MANION and KANNE, *Circuit Judges.*

PER CURIAM. Randy Schomas is 54 years old and suffers
from scoliosis and degenerative disc disease. The Social

Security Administration denied his application for Disability
Insurance Benefits after a hearing before an administrative law
judge. The district court upheld that determination, and in this
appeal Schomas challenges the ALJ's credibility finding and
assessment of his residual functional capacity. The ALJ's
decision is problematic, so this could have been a close case.
But Schomas waived most of his arguments, and the rest are
unfocused or undeveloped. Because the contentions that
Schomas properly presents are without merit, we uphold the
denial of benefits.

## I. BACKGROUND

Schomas was 49 when he applied for disability benefits in
March 2008. He alleged an onset date of December 19, 2007. On
that date Schomas was working as a machine operator and
injured his back while lifting mail bags weighing 50 to 100
pounds. His application for benefits was denied initially and
on reconsideration soon after it was submitted. Schomas then
requested a hearing before an ALJ.

The evidence before the ALJ includes extensive documenta-
tion of Schomas's post-injury medical treatment, which we
summarize. Schomas did not immediately seek treatment, but
two days after the injury he visited the occupational health
department at Illinois Valley Community Hospital. A physi-
cian there diagnosed a lower back strain, recommended that he
take ibuprofen and apply ice, and restricted him to lifting no
more than 10 pounds. At his next appointment a week later,
Schomas described a "constant sharp ache" in his back that
disturbed his sleep and was aggravated by walking and sitting.
The treating physician substituted a different anti-inflamma-

tory for the ibuprofen and prescribed a muscle relaxant. But he increased to 15 pounds the weight that Schomas could lift and authorized his return to work with the caveat that he avoid bending and stooping. After another week Schomas told the physician that he was improving though still experiencing discomfort in his lower back radiating into his right hip. This time the doctor cleared Schomas to work without restriction but recommended that he continue taking nonprescription anti-inflammatories and apply ice and heat.

Schomas was back at work full-time by the first week of January 2008, though he still complained about pain. He was seen in January 2008 by chiropractor Elizabeth Elliot, who had treated him sporadically for spinal problems since 1992. Her physical examination confirmed pain and tenderness in Schomas's lower back and a decreased range of motion. Elliot treated Schomas every few days through the end of March 2008 and every two weeks after that. His symptoms had diminished with treatment, he reported, but would flare if he sat for too long, did housework, lay in a tanning bed, went fishing, or carried a suitcase.

Schomas was laid off from his job in February 2008, the month before he applied for benefits. Since then has not been employed. Before submitting his application he retained an attorney, who recommended that he consult orthopedic surgeon Mark Lorenz. At his appointment in March, Schomas told Dr. Lorenz that some days were better than others but on any given day the pain in his back ranged from 7 to 10 on a scale of 10. An X-ray revealed scoliosis, significant arthritis in the left hip, and degenerative disc disease. Degenerative disc disease is the label given wear on the spinal discs that can

cause back pain radiating into the buttocks and upper thighs. *Univ. of Md. Med. Ctr., Degenerative Disc Disease,* http://umm.edu/programs/spine/health/guides/degenerative -disc-disease (last updated July 3, 2013). On a work-status report Dr. Lorenz checked the box labeled "Unable to return to work." He prescribed an oral corticosteroid, and after that Schomas did not return for another five months.

A nonexamining agency medical consultant, Dr. Delano Zimmerman, reviewed Schomas's medical records in April 2008 and assessed his residual functional capacity (or "RFC"). Dr. Zimmerman concluded that Schomas could lift 20 pounds occasionally and 10 pounds frequently, could climb occasionally, and could sit, stand, or walk for 6 hours in an 8-hour workday. Another state-agency physician, Dr. Bharati Jhaveri, concurred with Dr. Zimmerman's assessment.

In May 2008, immediately after the initial denial of benefits, Schomas consulted a second orthopedic surgeon, Dr. Stephen Heim. The change in physicians is not explained in the record. Schomas told Dr. Heim that his symptoms had waxed and waned since the December 2007 injury. Dr. Heim obtained X-rays and echoed Dr. Lorenz's diagnoses of scoliosis, arthritis of the hip, and disc disease; he also added a fourth malady, lumbar radiculopathy. Lumbar radiculopathy is a painful condition of the nerve roots in the lower spine, often caused by disc herniation or compression. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1571 (32nd ed. 2012). Dr. Heim concluded that Schomas could work so long as he did not bend, twist, squat, or lift more than 25 pounds. The physician prescribed physical therapy and a narcotic for pain. When Schomas next visited a month later, he reported that any

activity exacerbated the pain in his back and leg. Dr. Heim
ordered an MRI; that diagnostic was conducted in July 2008
and confirmed the diagnoses of scoliosis and disc degenera-
tion.

Schomas initially complied with the prescription for
physical therapy, and the therapist saw progress: Schomas was
reporting greater tolerance to activity and seemed to be in less
pain and have increased mobility. Yet after ten weeks of
sessions, the therapist reported to Dr. Heim that "we are
holding physical therapy at this time awaiting clarification and
any further order or advisement" because there was "some
issue with the patient in a transition of physicians."

Meanwhile, Schomas visited Dr. Lorenz again in August
2008. He rated his pain as 7 on a scale of 10 and said that 6 was
average, 5 was best, and 9 the worst. Dr. Lorenz again checked
the box on Schomas's work-status report declaring him
"Unable to return to work," ordered another RFC assessment,
and referred Schomas to a pain specialist because he "is not a
surgical candidate."

Alyssa Emanuelson, a certified athletic trainer and func-
tional assessment specialist, evaluated Schomas's RFC in
September 2008. She opined that he could sit or stand for 60
minutes at a stretch and lift 37 pounds occasionally and 21
pounds frequently. During an 8-hour workday, Emanuelson
continued, Schomas could sit for 8 hours, stand for 5 to 6
hours, and walk for 4 to 5 hours. Schomas's limitations, she
concluded, would prevent him from returning to his past
employment or other medium work.

That same month Schomas visited pain specialist Ira Goodman. Schomas reported pain of 7 on a scale of 10 and said that the pain always was present in varying intensity, from 5 at best to sometimes 10 with 7 the average. He said the pain caused him to wake several times every night. He could control it by sitting or lying down most of the day, and walking also helped. Dr. Goodman opined that Schomas "should be off work while under treatment." During outpatient procedures Dr. Goodman administered two epidural steroid injections. Schomas reported no improvement from the first, but Dr. Goodman observed significant functional improvement. After the second injection in late October 2008, Schomas reported decreased pain, and Dr. Goodman declared him "disabled" but fit to return to work at jobs that didn't require him to bend, twist, or continuously stand for more than one hour. Dr. Goodman ordered a different series of steroid injections, which Schomas received in March 2009.

Then in April 2009 Schomas consulted a third orthopedic surgeon, Alexander Ghanayem, who recommended back surgery. As before, the change in physicians is not explained in the record. In July Dr. Ghanayem performed three surgical procedures during one operation: an anterior lumbar interbody fusion, posterior laminotomy, and partial facetectomy. The anterior lumbar interbody fusion involved replacing one of his spinal discs with a bone graft substitute. *Am. Academy of Orthopaedic Surgeons, Anterior Lumbar Interbody Fusion,* http://orthoinfo.aaos.org/topic.cfm?topic=A00595 (last updated June 2010). The laminotomy and facetectomy were performed to decompress his spinal nerve root. See STEDMAN'S MEDICAL DICTIONARY 1046 (28th ed. 2006); *Wikipedia, Facetectomy,*

http://en.wikipedia.org/wiki/Facetectomy (last visited Aug. 7, 2013).

A month after the surgery, Dr. Ghanayem concluded that Schomas was not ready for physical therapy or work but decreased his narcotic pain killer and continued his walking program. Schomas continued seeing Dr. Ghanayem on a monthly basis. In November 2009 the doctor ordered an RFC assessment after noting that Schomas had increased his activity level and that X-rays showed him ready to begin conditioning for work.

A different physical therapist, Lanny Slevin, conducted this RFC evaluation over four hours in January 2010. Slevin concluded that Schomas could perform light work not requiring him to lift more than 23 pounds to his shoulder, or more than 13 to 18 pounds over his head. Slevin also limited Schomas to work requiring no more than occasional sitting, standing, walking, bending, squatting, stair climbing, kneeling, or crawling. Slevin opined that Schomas's main obstacles for returning to work were "subjective reports of high rated pain," decreased tolerance to long periods of activity, and restricted range of motion in the trunk. Dr. Ghanayem evaluated and approved Slevin's report, and in January 2010 cleared Schomas to work with the limitations noted. Schomas did not see Dr. Ghanayem again.

Dr. Ghanayem's assessment in January was the last word medically on Schomas's back and related problems before his administrative hearing in May 2010. Schomas told the ALJ that walking more than a couple of blocks caused his right leg to hurt, standing for more than 30 minutes triggered pain in his

back, and sitting caused tingling in his toes and burning in his hip. Any exertion, Schomas continued, caused pain. Schomas said that he cooks, vacuums, and washes dishes and laundry but not without some pain to his back. And he needs help—which he gets from his brother and neighbors—for lifting, shoveling snow, and cutting the grass. When the ALJ inquired about current medical care, Schomas answered that he was still seeing his family doctor for high blood pressure and had an appointment scheduled for later that month. For his pain, Schomas said, he was taking a narcotic equivalent to Vicodin. Who prescribed that drug and when is not disclosed in the administrative record. Schomas asserted that the drug does not extinguish his pain but makes it bearable. When the ALJ asked if the drug causes side effects, Schomas responded, "Not that I'm aware of," but then added that he cannot stay focused and falls asleep throughout the day. Schomas's lawyer revisited this topic, asking how the drug makes him "feel mentally." Schomas replied that it makes him tired and groggy and that he cannot maintain concentration.

The ALJ posed hypothetical questions to vocational expert Michelle Peters. She testified that a person of Schomas's age and education (high school plus some community college) could not return to his past employment as a machine operator or shipping clerk if limited to light exertional work. But that person would be qualified, Peters said, for one of approximately 15,000 cashier positions, 3,000 assembly positions, and 3,500 hand-packaging positions in northern Illinois. When the ALJ further limited the jobs to those allowing the employee to sit or stand at will without becoming off task more than 10% of the time, Peters estimated that the suitable jobs would be

reduced to 1,800 assembly positions and 2,000 hand-packaging positions. Finally, the ALJ inquired about a person whose concentration and focus during work "dropped below 85%," and Peters responded that competitive employment could not be sustained.

The ALJ concluded that Schomas was not disabled. At Step 1 of the applicable 5-step analysis, *see* 20 C.F.R. § 404.1520, the ALJ found that Schomas had not engaged in substantial gainful activity after his alleged onset date. At Step 2 the ALJ found that Schomas suffers from scoliosis, degenerative disc disease, and degenerative arthritis. At Step 3 the ALJ concluded that these impairments, although severe, do not meet or equal a listed impairment.

The ALJ then found that Schomas had the RFC to perform light work, 20 C.F.R. § 404.1567(b), which does not require crawling or climbing ladders, ropes or scaffolds, and only occasional stooping, crouching, kneeling, and climbing ramps or stairs. The "functional capacity evaluation and finding of the state agency," the ALJ explained, support a determination that Schomas can perform light work. The ALJ recounted Schomas's medical history and, in light of the medical evidence, discredited his assertion of disabling pain. In particular, the ALJ noted that Schomas had received extensive conservative therapy and not used strong narcotics persistently. Moreover, the ALJ opined that someone with disabling pain would have been hospitalized frequently or frequented emergency rooms, which Schomas had not. Plus, the ALJ reasoned, no doctor had declared Schomas to be totally disabled by pain.

At Step 4 the ALJ found that Schomas could not perform his past work. At Step 5, though, the ALJ concluded that jobs exist which Schomas could perform given his RFC, age, education, and work experience.

## II. ANALYSIS

Because the Appeals Council denied review, we evaluate the ALJ's decision as the final word of the Commissioner. *See, e.g., Roddy v. Astrue,* 705 F.3d 631, 636 (7th Cir. 2013); *Shideler v. Astrue,* 688 F.3d 306, 310 (7th Cir. 2012); *Jelinek v. Astrue,* 662 F.3d 805, 807 (7th Cir. 2011).

*A. The ALJ's RFC Determination*

Schomas, who is represented by different counsel on appeal, first contends that the ALJ overstated his RFC. Schomas principally argues that the ALJ failed to mention the several doctors who restricted him from working at various times; those restrictions, he asserts, favored granting a closed period of disability. *See* 20 C.F.R. § 404.320. But prior counsel did not raise this argument in the district court, and thus it is waived. *See Skarbek v. Barnhart,* 390 F.3d 500, 505 (7th Cir. 2004); *Schoenfeld v. Apfel,* 237 F.3d 788, 793 (7th Cir. 2001).

Concerning his RFC, Schomas makes only one argument that is properly before us. Even that argument is difficult to decipher, but Schomas apparently contends that the ALJ relied primarily on the RFC determination of physical therapist Slevin but disregarded its most critical component. What the ALJ ignored, Schomas insists, is the restriction to occasional sitting, standing, and walking. That restriction means, says

Schomas, that he cannot do the "good deal of walking or standing" required for light work. *See* 20 C.F.R. § 404.1567(b).

Schomas's argument misses the mark. The ALJ acknowledged the RFC determination by Slevin in 2010 but so did the ALJ acknowledge the RFC assessments made in April 2008 by the state-agency reviewer, Dr. Zimmerman, and in September 2008 by Emanuelson. Yet in concluding that Schomas can perform light work, the ALJ explicitly linked his decision to the "functional capacity evaluation and finding of the state agency." Schomas interprets this reference to mean the RFC assessments from Dr. Zimmerman *and* physical therapist Slevin, but that reading ignores what the ALJ said. We understand the ALJ to have credited Dr. Zimmerman's assessment over the others. Yet, if that is so, says Schomas, then the ALJ's silence about why he gave controlling weight to one assessment over another requires us to remand the case because the ALJ did not "provide an accurate and logical bridge" from the evidence to his finding. But this kind of error is subject to harmless-error review, and we will not remand a case to the ALJ for further explanation if we can predict with great confidence that the result on remand would be the same. *See McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011); *Parker*, 597 F.3d at 924; *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010); *Keys v. Barnhart*, 347 F.3d 990, 994–95 (7th Cir. 2003); *see also Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003).

Our review of the record convinces us that the result would not change. There are three RFC assessments in the medical record. The earliest, by Dr. Zimmerman, does not impose any restriction on sitting, standing, or walking that would preclude light work. Neither does the second assessment by

Emanuelson, the assessment specialist, who gave her opinion
several months later at the request of one of Schomas's own
physicians. Only the most-recent assessment, performed in
January 2010 by Slevin, is possibly inconsistent with light
work. That RFC determination looks like an outlier, however,
and substantial evidence supports Dr. Zimmerman's assess-
ment. Shortly after Schomas's injury the physicians at Illinois
Valley Community Hospital told him he could return to work
without restriction. The second orthopedist that Schomas
consulted, Dr. Heim, prescribed work restrictions but none
pertained to sitting, standing, or walking. And after Schomas
received a series of steroid injections from Dr. Goodman, that
doctor told him he could work but should refrain from
standing continuously for more than an hour. Thus, even
though the ALJ should have better articulated his reasoning,
we cannot see how a different conclusion possibly could be
reached on remand.

*B. The ALJ's Adverse Credibility Finding*

Schomas also challenges the ALJ's credibility determina-
tion. He complains that the ALJ's decision includes boilerplate
language that is never connected to any analysis of the evi-
dence. And where the decision does include analysis, Schomas
continues, the analysis is limited to the medical evidence and
excludes consideration of many factors outlined in 20 C.F.R.
§ 404.1529(c) that were relevant in evaluating his allegation of
disabling pain. S.S.R. 96-7p, at *2. Many of those factors, he
insists, demonstrate his credibility.

Schomas's concern about the format of the ALJ's decision
is unfounded. The use of boilerplate is innocuous when, as

here, the language is followed by an explanation for rejecting the claimant's testimony. *See Pepper v. Colvin,* 712 F.3d 351, 367–68 (7th Cir. 2013*); Filus v. Astrue,* 694 F.3d 863, 868 (7th Cir. 2012). The boilerplate is not problematic.

Other claimed errors might have been. Yet in Schomas's brief to the district court, he contested only the ALJ's use of boilerplate and, citing generally to SSR 96-7, argued that the ALJ's credibility finding must be supported by the entire record. Schomas did not point to a single factor outlined in SSR 96-7 that the ALJ omitted or how the corresponding evidence would support his argument. And though he elaborates in his appellate brief, now is too late; his argument to the district court was undeveloped and, thus, is waived on appeal. *See Schoenfeld,* 237 F.3d at 793 (7th Cir. 2001); *United States v. Lanzotti,* 205 F.3d 951, 957 (7th Cir. 2000). Even so, much of the reasoning behind the ALJ's credibility finding is troubling, and so we add a few observations.

We give special deference to an ALJ's credibility determination and will not overturn it unless it is patently wrong. *Jones v. Astrue,* 623 F.3d 1155, 1160 (7th Cir. 2010); *Larson v. Astrue,* 615 F.3d 744, 751 (7th Cir. 2010). But if "the determination rests on objective factors or fundamental implausibilities rather than subjective considerations" like demeanor, we "have greater freedom" in reviewing the decision. *Indoranto v. Barnhart,* 374 F.3d 470, 474 (7th Cir. 2004) (internal quotation marks and citation omitted). In making a credibility finding the ALJ must evaluate the claimant's pain level, medication, treatment, daily activities, and limitations. *See* 20 C.F.R. § 404.1529(c); *Terry v. Astrue,* 580 F.3d 471, 477 (7th Cir. 2009).

Schomas briefly complains that the ALJ did not mention the severity of his pain or his mental and physical limitations from his medication. Had it been preserved, this contention might have had traction. The ALJ noted that Schomas acknowledged that his pain medication helps. But that observation does not accurately reflect Schomas's testimony. He testified that his prescription drug makes his pain bearable, but still he is in pain any time he exerts himself. The ALJ also stated that Schomas testified that he was not experiencing side effects. True enough, Schomas said no when the ALJ asked if he was experiencing side effects. Yet when his lawyer asked how the medication makes him "feel mentally," Schomas explained that it makes him tired and groggy. He already had said that he cannot stay focused throughout the day and is constantly napping. These statements are particularly relevant given the vocational expert's conclusion that a person whose focus drops below 85% could not sustain competitive employment (another point the ALJ neglected to mention). If the ALJ disbelieved Schomas, he needed to explain that finding in order to build a logical bridge between the evidence and his conclusion. *See Shauger v. Astrue*, 675 F.3d 690, 697–98 (7th Cir. 2012); *Villano v. Astrue*, 556 F.3d 558, 562–63 (7th Cir. 2009). The ALJ should have evaluated Schomas's subjective reports of pain, fatigue, and concentration.

Other pieces of the ALJ's credibility determination also rest on shaky grounds. The ALJ reasons that Schomas received extensive conservative therapy and that, had he really been disabled by pain, he would have been hospitalized or at least visited the emergency room more frequently. This reasoning, Schomas asserts, impermissibly substitutes the ALJ's personal

observations for the considered judgment of medical profes-
sionals. *See Myles v. Astrue*, 582 F.3d 672, 677–78 (7th Cir. 2009);
*Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 569–70 (7th Cir.
2003). We might agree. Schomas indeed *began* with conserva-
tive therapy, such as over-the-counter anti-inflammatories,
chiropractic treatment, and physical therapy. But over time his
treatment became more aggressive. Schomas was prescribed
narcotic pain relievers, submitted to steroid injections, and
finally underwent major surgery. Those treatments belie the
ALJ's conclusion that Schomas was treated conservatively.

The Commissioner counters that "because many claimants
are hospitalized and/or receive emergency room treatment, it
is logical and appropriate to consider the number and fre-
quency of the claimant's hospitalizations and emergency room
visits." And, the Commissioner insists, the ALJ's reasoning
rests "on the commonsense idea that a person who is disabled
by pain might seek medical treatment for that pain beyond that
provided by ordinarily scheduled visits with his doctors." But
we do not understand the Commissioner's point; a person
suffering continuous pain might seek unscheduled treatment
if that pain unpredictably spikes to a level which is intolerable,
but otherwise why would an emergency-room visit be sensi-
ble? Unless emergency treatment can be expected to result in
*relief*, unscheduled treatment in fact makes no sense.

### III. CONCLUSION

Again, had Schomas developed these contentions in the
district court, there might be something to this appeal. As it
stands, though, we uphold the denial of benefits.