NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued July 9, 2014
Decided August 4, 2014

**Before**

RICHARD A. POSNER, *Circuit Judge*

MICHAEL S. KANNE, *Circuit Judge*

ANN CLAIRE WILLIAMS, *Circuit Judge*

No. 13-3531

| | |
|---|---|
| JEAN ARTHA THOMPSON, *Plaintiff–Appellant*, | Appeal from the United States District Court for the Central District of Illinois. |
| *v.* | No. 12-1435 |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, *Defendant–Appellee*. | James E. Shadid, *Judge*. |

## O R D E R

Jean Thompson filed two applications for Disability Insurance Benefits ("DBI"), alleging different impairments in overlapping periods. The Appeals Council consolidated her applications, amended the onset date of her disability to August 2007, and remanded. Thompson narrowed her claim to allege that she became disabled from fibromyalgia and chronic fatigue syndrome. An administrative law judge rejected this claim, and the Appeals Council denied review. The district court concluded that sufficient evidence supports the ALJ's decision. Thompson appeals raising six issues, but we conclude that she waived three of those by failing to raise them in the district court. The remaining three issues, challenging the ALJ's handling of the testimony of her primary-care physician, its RFC

determination, and its description of her fibromyalgia diagnosis, lack merit. We therefore affirm the judgment.

## I. BACKGROUND

Thompson was 55 years old when she first applied for DIB. She had stopped working a year earlier, in January 2005, after taking a disability leave from her job as a business analyst for State Farm Insurance.

### 1) Medical History

Thompson has received treatment for a host of mental and physical conditions since at least 2003. She began seeing Dr. Stephen Belgrave, a family physician, in 1983, and as early as December 2003 complained to him that fatigue, restless legs, and problems sleeping were keeping her from full-time work. A psychiatrist, Dr. Charles Hawley, prescribed Thompson medication for her fatigue, which she reported "helped a lot," allowing her to return to full-time work in October 2004. In November 2004, she began complaining of back pain, and Dr. Belgrave referred her to pain specialist and osteopath Dr. Christopher Rink. Dr. Rink noted that Thompson exhibited features often associated with fibromyalgia, except that her pain was limited to her head and did not diffuse into her extremities, as is typical with fibromyalgia. Thompson's sleep improved, and in January 2005 she vacationed in Hawaii.

When Thompson returned from her trip, however, Dr. Belgrave advised her not to return to work and to allow further evaluation based on her "constellation of symptoms and long-standing problems." Thompson gradually improved in the subsequent weeks, but Dr. Belgrave advised her to remain home because "she is on the verge of needing disability" and returning to work "might cause her to be terminated." In February 2005, Thompson contacted a physician working with State Farm, Dr. Zehr about pursuing disability benefits.

Dr. Hawley met with Thompson again in March and wrote in his progress notes that he had spoken with Dr. Zehr, who told him that Thompson had been on temporary disability intermittently for several years and feared that Thompson would be fired if she returned to work before fully recovering. Dr. Hawley opined that "probably she is not going to improve" and "she probably does have an early dementia," yet he diagnosed her only with a somatoform disorder—a mental illness that can cause bodily symptoms, such as pain, without any physical cause. *See Somatoform Disorders*, WEBMD.COM,

http://www.webmd.com/mental-health/somatoform-disorders-symptoms-types-treatment (last reviewed on May 29, 2014).

Drs. Belgrave and Hawley in April 2005 referred Thompson to a neuropsychologist, Dr. Joseph Alper, to evaluate her memory problems. He concluded that Thompson's behavior was "strongly suggestive of a fronto-temporal dementia," also known as Pick's disease, *see NINDS Frontotemporal Dementia Information Page*, NIH, http://www.ninds.nih.gov/disorders/ picks/picks.htm (last updated July 18, 2014). However, it was not until a follow-up in June 2005 that he gave that as his diagnosis. Also in April 2005, neurologist Dr. William Landau evaluated Thompson for back pain. He found no cause for the pain but reported that Thompson had said she felt unable to sit still for two hours at a time, had a tingling sensation in her toes, and "really doesn't want to go back to work," preferring to stay home with her new boyfriend.

In July 2005, Thompson told Dr. Hawley that she disagreed with Dr. Alper's diagnosis of Pick's disease. While Dr. Hawley agreed with Dr. Belgrave that her illness was not work-related, he sent a letter to State Farm recommending that she go on permanent disability based on her Pick's disease. In August 2005 Thompson saw another neurologist, Dr. Kristopher Bujarski. He reported Thompson's chief complaint as back pain. He also spoke with Thompson's daughter and boyfriend; the boyfriend related little evidence of a serious condition, but the daughter stated that Thompson's personality had "dramatically change[d]" and that her lifestyle had changed. Dr. Bujarski agreed that "the most likely diagnosis is frontotemporal dementia."

In September 2005, Thompson was asked by State Farm to take a permanent disability leave. The next month, on a referral from Dr. Hawley, she saw yet another neurologist, Dr. Karyn Catt, who noted that Thompson seemed to have several memory issues and "probably is an unreliable historian." Dr. Catt agreed with the diagnosis of Pick's disease. Although Thompson initially said that "she does not mind having this diagnosis so that she can receive disability," she later became agitated when Dr. Catt mentioned the diagnosis of probable dementia.

In February 2006, Dr. Belgrave stated in a progress note that Thompson should qualify for permanent disability because she had shown symptoms of back pain for more than six months. He completed a form stating as much. It was then that Thompson first applied for disability insurance benefits based on her diagnoses of Pick's disease and restless leg syndrome, though she had not complained about the latter since 2004. She did

not assert any difficulties working based on back pain, chronic fatigue, or fibromyalgia. Thompson alleged an onset date in January 2005.

The next month, in March 2006, Thompson met with psychologist Dr. William Hilger on a referral; Dr. Hilger reviewed Thompson's psychological problems in connection with her disability application. Dr. Hilger opined that Thompson did not have dementia, "certainly not of the Pick's type if she does have dementia," and was mentally capable of managing benefit payments, if she received them. In April 2006, Dr. Hima Alturi, a consulting physician, examined Thompson and reported no limitations on limb movements, walking, squatting, or any other functions attributable to her back pain.

In May 2006, Dr. Belgrave completed a "Physical Capacities Evaluation" in support of Thompson's application for disability benefits. He concluded that in an 8-hour workday, Thompson could occasionally climb, balance, stoop, kneel, crawl, reach above her head, and carry up to 50 pounds. He believed a sit–stand option would benefit Thompson based on her back pain and that Pick's disease was her "main disabling factor."

Also in support of her application, psychologist Dr. Cheri Miller, who had been treating Thompson since May 2005, submitted a letter stating that Thompson seemed unable to "handle the riggers [sic] of full time employment." By the end of 2006, Dr. Belgrave opined in his notes that Thompson soon could return to part-time work that "does not cause a lot of psychological stress." In May 2007, he wrote in a letter addressed "To Whom It May Concern" that Thompson "would be unable to perform her required duties" if placed in a stressful work environment. In July 2007, Dr. Shanna Kurth, yet another neuropsychologist, conducted an independent assessment of Thompson from an unspecified referral. Dr. Kurth disagreed with Dr. Belgrave and found "[n]o evidence of a formal thought disorder," questioned the diagnosis of dementia, and instead concluded that Thompson had a personality disorder or somatoform disorder and simply did not want to return to work.

In August 2007, State Farm ended Thompson's disability coverage because, Thompson was told, there was nothing medically wrong with her, and it was "all in [her] head." Soon thereafter, psychiatrist Dr. Carmen Chase examined Thompson, concluding that she did not have dementia but did have Major Depressive Disorder and, in agreement with Dr. Kurth, also might have a somatoform disorder. Dr. Chase added that it was possible Thompson was malingering. In a follow-up visit with Dr. Chase in May 2008, Thompson reported that her disability benefits had been restored by State Farm, and

Dr. Chase reported seeing no sign of cognitive decline, which is "inconsistent with Pick's disease." *See Pick disease*, MEDLINEPLUS, http://www.nlm.nih.gov/medlineplus/ency/article/000744.htm (last updated July 9, 2014). Dr. Hilger reevaluated Thompson in March 2009 and agreed that she showed no signs of Pick's disease, but he did agree with Dr. Kurth that she showed signs of a somatoform disorder.

Although Dr. Rink had first raised the possibility of fibromyalgia in November 2004, Thompson was not diagnosed with that condition until September 2008 after an exam by a physician specializing in pain management. A rheumatologist agreed with that diagnosis after evaluating Thompson in November 2009, and the next month, Dr. Belgrave referred Thompson to Dr. Ellen King, an anesthesiologist, for "a second opinion for her diagnosis of Fibromyalgia for insurance purposes." According to Dr. King, Thompson told her that the purpose of her visit was "to find a physician who will either agree with the diagnosis of Pick's disease so that she may obtain social security disability or confirm that she will be disabled due to her diagnosis of fibromyalgia." Dr. King found no neurological distress and advised Thompson that fibromyalgia "is not necessarily a debilitating disease if the recommended therapy is adhered to." But in February 2010, in support of her second application for disability benefits, Dr. Belgrave reported that Thompson's fibromyalgia "contributes wiyh [sic] physical limitations to her return to work," though he acknowledged that the diagnosis of Pick's disease "is now questioned."

Yet another physician, family specialist Dr. James D. Ausfahl, concluded in April 2010 that Thompson had no functional capacity limitations despite her history of fibromyalgia, though he did note that her visual acuity was somewhat limited. And in May 2010, a state-agency reviewing physician and general practitioner, Dr. Sandra Bilinsky, assessed Thompson's functional limitations, concluding that in an 8-hour workday, Thompson could lift, carry, push, or pull up to 20 pounds, stand or walk for 6 hours, and sit for 6 hours. She found no postural, manipulative, or environmental limitations, and concluded that Thompson's description of her limitations was not supported by the medical evidence. Dr. Bilinsky also concluded that Thompson's far visual acuity was limited. A state-agency psychologist, Dr. Phyllis Brister, concluded also in May 2010 that Thompson's "Somatoform Disorder and Alcohol Dependence in reported remission" did not satisfy any disability under the Listing of Impairments.

By August 2010, Dr. Belgrave had expressed concern that Thompson was not properly addressing her fibromyalgia. He told her to "become more aggressive" in managing her condition, including with aqua therapy and Tai Chi or another stretching

regimen. Thompson followed up with Dr. Rink, who noted that Thompson had not yet started her therapy as of January 2011 because "she is just too tired to get out for therapy." In March 2011, Dr. Rink again saw Thompson, who was concerned about her pending claim for DIB and whether the diagnosis of fibromyalgia would entitle her to benefits. In May 2011, Dr. Belgrave wrote in another letter addressed "To Whom It May Concern," that Thompson was "unable to perform any work related activities" and "minimally functional" at daily activities. He again acknowledged that the diagnosis of Pick's disease may not have been accurate and described her fibromyalgia as "variable in a waxing and waning fashion."

**2) Procedural History**

Thompson's first application for disability benefits, based on Pick's disease and restless leg syndrome, was denied on September 16, 2009 after a hearing, and she sought review of the ALJ's decision. In January 2010, while her appeal was pending before the Appeals Council, Thompson filed a second application for DIB, this time identifying "chronic fibromyalgia/small strokes/unable to focus" as the cause of her disability. In May 2010, on the basis of the second application, the state agency found Thompson disabled as of August 2007. The Social Security Administration challenged that determination before the Appeals Council, and the Appeals Council consolidated the agency's appeal with Thompson's appeal, which still was pending. Almost one year later, in March 2011, the Appeals Council reviewed the ALJ's denial of Thompson's first application, reopened the second application, and remanded Thompson's now-consolidated applications for reevaluation as of August 2007 (a date Thompson does not challenge) of her alleged impairments: restless leg syndrome, fibromyalgia, degenerative disc disease (from which apparently Thompson had alleged at her first hearing that she also suffered), and chronic fatigue syndrome and somatoform disorder (from which the state agency had determined Thompson suffered, even though she had not included either in her application).

On remand, the ALJ conducted a second hearing in September 2011. Dr. Richard Gross, a neuropsychologist who also has a Ph.D. in clinical psychology and who had not met with or examined Thompson, opined that her medical records suggest that she suffered only from a somatoform disorder, a "situational occurrence" that did not significantly affect her functional capacity. Thompson's daughter testified that she would run errands for her mother, who told her that "she was in a lot of pain." Thompson also testified and explained that State Farm had asked her to go on disability in 2005, but the payments had run out on August 1, 2007. She testified that getting dressed had become too

painful and that she had hired out her household chores—grocery shopping, household cleaning, and dog care—because she lacked the energy to do them herself. She also said that in November 2010 she had graduated from a year-long interior-decorating class and now was a certified interior decorator, though she said she had taken the class "for fun" and "mainly because to occupy time." She also testified that as of January 2009 she had been helping a friend manage the books of his landscaping business by making phone calls and sending invoices.

A vocational expert also testified. According to the VE, Thompson's previous work with State Farm was project-oriented and flexible, allowing the employee to rest as needed so long as the project was completed by day's end. He added that limitations on climbing ladders or ropes, bending, stooping, reaching, and exposure to humidity and environmental hazards would not affect a person's ability to do light work in this field.

The ALJ, in a 51-page opinion, concluded that Thompson was not disabled between August 2007 and her last date insured, December 31, 2010. The ALJ reviewed Thompson's claims under the five steps in 20 C.F.R. § 404.1520(a), first finding that during the relevant time period she had not engaged in substantial gainful employment and was suffering from severe impairments: restless leg syndrome, fibromyalgia, degenerative disc disease, and limited visual acuity. The ALJ concluded, however, that the evidence did not support Thompson's assertions that she also suffered from Pick's disease or a somatoform disorder. The ALJ noted that Thompson appeared to be a manipulative, demanding patient aimed only at obtaining a diagnosis that would win her disability payments. Regarding her physical limitations, the ALJ accepted the diagnosis of fibromyalgia but rejected the testimony of Thompson and her daughter, which contradicted forms that Thompson and her daughter had submitted in April 2010 stating that the daughter did not assist in a significant or regular manner. The ALJ determined that, at most, Thompson had a "mild" mental impairment. *See* 20 C.F.R. § 404.1520a(d)(1).

The ALJ found that Thompson's impairments did not meet or equal those listed in Appendix 1 to 20 C.F.R. Part 404, Subpart P, and that she had the residual functional capacity to perform sedentary work. *See* 20 C.F.R. § 404.1567(a). The ALJ noted that Thompson described her ability to pull, bend, stoop, and perform various household activities throughout the day. That did not mean, the ALJ explained, that she could perform the same types of activities during a workday, but her testimony contradicts documents that Thompson had submitted (and her testimony) asserting that she had to hire out all of her household activities. Moreover, the ALJ noted, Dr. Belgrave had opined that Thompson needed to follow her prescribed rehabilitation routine and stay active. As the ALJ summed

up, "[n]ot being motivated to work is not equivalent to not being able to work." Were she motivated, the ALJ concluded, Thompson could perform a limited range of sedentary work, including her past work as a business analyst.

Thompson sought review in the district court, arguing that the ALJ improperly had discounted her diagnoses of Pick's disease and a somatoform disorder as insignificant, failed to consider her fibromyalgia in connection with her other physical impairments in determining if she met a Listing in section 404 or if she could perform past work, and gave insufficient weight to Dr. Belgrave, who was her primary-care physician. The court determined that substantial evidence supports the ALJ's decision.

## II. ANALYSIS

Because the Appeals Council denied review, we evaluate the ALJ's decision as the final word of the Commissioner. *See Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013); *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013). We will uphold an ALJ's decision so long as it is supported by substantial evidence. *Pepper v. Colvin*, 712 F.3d 351, 361–62 (7th Cir. 2013); *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012). On appeal Thompson does not challenge the ALJ's findings regarding her diagnosis of Pick's disease, so we will not further discuss that issue. Additionally, as the Commissioner argues, Thompson did not raise three of her six appellate challenges in the district court, namely that the ALJ: (1) did not credit Dr. Hilger's conclusions that she may have a somatoform disorder and difficulty working full time; (2) failed to evaluate her chronic fatigue syndrome; and (3) found her not credible regarding her physical limitations in colder weather. Thompson is silent about waiver in her reply brief. We agree with the Commissioner that these issues were waived and address only those issues properly before this court. *See Schomas*, 732 F.3d at 707; *Skarbek v. Barnhart*, 390 F.3d 500, 505 (7th Cir. 2004).

### 1) Dr. Belgrave

Thompson first argues that the ALJ failed to give "controlling weight" to letters written by Dr. Belgrave in August 2006, May 2007, January 2009, and May 2011. Dr. Belgrave was Thompson's primary care physician since 1983, and between February 2003 and May 2011, he examined her at least 34 times and granted and reviewed referrals, Thompson explains, so his opinion deserves controlling weight in the ALJ's analysis. Thompson says the ALJ did not give any reason for rejecting Dr. Belgrave's opinion. However, the ALJ properly recognized the August 2006 letter was written before

the amended onset date of August 2007, and because the May 2011 letter was written five months after her last date insured, the ALJ gave this final letter "essentially no value."

An ALJ must accord controlling weight to a treating source's opinion if it is supported by "medically acceptable clinical and laboratory diagnostic techniques" and is consistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(c)(2); *see Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010). But a medical expert's report that is based solely on a complainant's subjective accounts of pain is not given controlling weight. *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012). As the ALJ noted, Dr. Belgrave never diagnosed Thompson as having fibromyalgia; rather, he simply repeated the diagnosis given by other doctors. And although Dr. Belgrave opined that Thompson would have difficulty performing various physical activities based on common fibromyalgia symptoms and that her condition "contributes" to her physical limitations, he did not describe the level or severity of Thompson's symptoms. The ALJ described Dr. Belgrave as having "no reliable objective evidence" regarding Thompson's condition and relying largely on Thompson's self-reports, which are prone to bias. *See Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006). The ALJ recounted Thompson's testimony that she could pull, bend, and stoop during household activities, which the ALJ carefully distinguished from workplace duties, and an RFC assessment from 2010 that concluded Thompson could perform light work. From this evidence the ALJ concluded that Thompson could perform at least sedentary work, consistent with Dr. Belgrave's opinion from 2006.

Dr. Belgrave's conclusion in May 2011 that Thompson could not work also is inconsistent with other reports. Thompson told Dr. King that her goal of the evaluation was to receive a diagnosis of fibromyalgia and obtain disability benefits. Dr. King told Thompson that therapy could alleviate her symptoms and that her condition need not be debilitating. Dr. Rink referred Thompson to a physical therapist, and Dr. Belgrave in August 2010 agreed that therapy was appropriate, but opined that Thompson needed to be "aggressive" about treatment. Yet Dr. Belgrave does not mention this poor compliance in his May 2011 letter in which he says Thompson is unable to work. As the ALJ said, the evidence suggests not that Thompson could not improve her pain but rather than she lacked the motivation to work towards resolving it. Substantial evidence supports the ALJ's determination that Dr. Belgrave's opinion was of limited value.

### 2) RFC Determination

Thompson next argues that the ALJ gave "an inadequate RFC" to the VE that omits several details of her condition, and thus the VE's conclusion that she could perform her

past work is unreliable. She says that the VE's assessment is based only on her best days, but her fibromyalgia intermittently gets worse, so she does not know how she will feel on a given day. Thompson also says the ALJ did not include in his hypothetical questions to the VE whether she would be able to sit and stand to accommodate her pain.

We see no issue with the ALJ's hypothetical questions. The ALJ proposed to the VE a hypothetical worker limited to light work, with only occasional overhead reaching and manipulative functions. The VE testified that such a claimant would be able to perform the work of a business analyst. As the VE explained, this job allows for breaks as needed, as long as the employee completes her designated projects in a timely manner. So, although Thompson is correct that the ALJ did not specifically reference the need for a sit/stand option, the VE included in his assessment the need for flexibility with breaks. Based on that assessment, the ALJ concluded that Thompson could perform her past work as a business analyst, which, as sedentary work, is considered less demanding than light work. SSR 83-10, 1983 WL 31251, at *5–6. Moreover, the hypothetical questions that the ALJ posed appropriately were based on the limitations that he accepted as credible. *See Simila v. Astrue*, 573 F.3d 503, 521 (7th Cir. 2009); *Schmidt v. Astrue*, 496 F.3d 833, 846 (7th Cir. 2007). Those limitations did not include Dr. Belgrave's recommendation for a sit/stand option because the ALJ concluded that this purported limitation was based entirely on Thompson's subjective statements, rather than medical evidence.

### 3) Misconstruing Fibromyalgia Diagnosis

Last, Thompson argues that the ALJ misunderstood fibromyalgia and improperly discredited the medical evidence she presented regarding her diagnosis. She points to SSR 12-2p, which was issued after the ALJ's decision in this case and provides guidance for determining if a claimant's fibromyalgia is "medically determinable." Thompson encourages us to remand the case so that her claim can be considered further with the aid of SSR 12-2p. But a remand is unnecessary because the ALJ accepted Thompson's diagnosis of fibromyalgia as a severe physical impairment that limits her functional capacity. That diagnosis, however, does not entitle Thompson to benefits. *Denton v. Astrue*, 596 F.3d 419, 426 (7th Cir. 2010); *Skinner v. Astrue*, 478 F.3d 836, 845 (7th Cir. 2007). The ALJ instead concluded that Thompson's condition was not debilitating and would not preclude her from performing her past sedentary work. The ALJ reviewed her test revealing 17 positive tender points but no other issues of pain and assessed her functional capacity based on her limited physical capabilities; yet the ALJ concluded that her fibromyalgia was not incapacitating. Those findings are supported by substantial evidence.

### III. CONCLUSION

The judgment of the district court and the ALJ's denial of benefits are AFFIRMED.