**NONPRECEDENTIAL DISPOSITION**

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued November 18, 2014
Decided January 29, 2015

**Before**

WILLIAM J. BAUER, *Circuit Judge*

DANIEL A. MANION, *Circuit Judge*

ANN CLAIRE WILLIAMS, *Circuit Judge*

No. 13-3275

| | |
|---|---|
| LINDA DURR-IRVING, also known as LINDA LEE IRVING, *Plaintiff-Appellant*, | Appeal from the United States District Court for Northern District of Illinois, Eastern Division. |
| *v.* | No. 12 CV 5519 |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, *Defendant-Appellee*. | Young B. Kim, *Magistrate Judge*. |

**O R D E R**

Linda Durr-Irving is 57 years old and suffers from chronic obstructive pulmonary disease, asthma, a surgically repaired torn rotator cuff, and urinary incontinence. She appeals from a magistrate judge's decision (by consent) upholding the denial of her applications for Disability Insurance Benefits and Supplemental Security Income. Durr-Irving principally contends that the administrative law judge exaggerated her residual functional capacity after ignoring her testimony and medical evidence concerning her urinary incontinence. Because the ALJ failed to analyze the evidence of Durr-Irving's urinary incontinence and thus neglected to factor that condition into her

RFC, we reverse the magistrate judge's decision and remand to the Social Security Administration for further proceedings.

I.

Durr-Irving was 51 when she applied for DIB and SSI in February 2009. She alleged that she had become disabled eight months earlier, in June 2008, when she no longer could work because of the combined effects of her chronic obstructive pulmonary disease, asthma, and shoulder impairment, as well as hypertension and vocal-cord polyps. At the time she said nothing about urinary incontinence.

Durr-Irving had worked from 1999 to 2005 as a packer and machine operator for Turtle Wax, which makes products to protect and restore car exteriors. One day at work in December 2002, Durr-Irving tore her right rotator cuff while connecting a hose to a pump. (The rotator cuff is a group of muscles and tendons surrounding the shoulder joint that keep the upper arm bone in the shoulder socket, see *Rotator Cuff Injury, Mayo Clinic,* http://www.mayoclinic.org/diseases-conditions/rotator-cuff-injury/basics/definition/con-20031421 (last visited Dec. 1, 2014).) She had two surgeries for this injury, the first a few months after it occurred and another a year and a half later. (A claim for workers' compensation resulted in a $9,000 settlement.) A month after the first surgery, Durr-Irving returned to work but under restrictions to use only her left hand and not lift more than 10 pounds; by the fall of 2003 she was able to work without restrictions. The pain returned, however, and in February 2004 her rehabilitation doctor restricted Durr-Irving to lifting no more than five pounds and no overhead activity. The second surgery was performed by a different surgeon, who permitted Durr-Irving to return to work about two weeks later but restricted her to sedentary work without using her right arm. By the end of the year, most of her work restrictions had been lifted, and she was permitted to use her right arm to lift, push, and pull under 20 pounds, but she still could not perform overhead lifting. She left Turtle Wax at the end of 2005, and a year later she began working as a home aide for the elderly, assisting clients with grocery shopping, doctor visits, light housework, and cooking.

Durr-Irving also has a history of respiratory problems. She smoked up to two packs of cigarettes a day for nearly three decades. She cut back in 2008 to a pack a week because she was having difficulty breathing, and by 2010 she was smoking only "every now and then." Durr-Irving struggles with chronic obstructive pulmonary disease and asthma, which she controls with daily inhalers, and she has prescriptions for corticosteroids to take as needed if she experiences wheezing, coughing, or other

breathing problems. She also has hypertension, and on her vocal cords she developed polyps (a mass of tissue projecting out from the normal surface level, see STEDMAN'S MEDICAL DICTIONARY 1423 (27th ed. 2000)), which were removed in March 2009, shortly after she applied for disability benefits.

When Durr-Irving applied for disability benefits in early 2009, she reported that her chronic obstructive pulmonary disorder, asthma, hypertension, and vocal-cord polyps limited her ability to work because she had trouble breathing and could not stand or walk for long periods. She asserted that she could lift not more than five pounds and could not walk more than half a block before needing to rest. She added that she typically stayed in her room all day but regularly attended church and sometimes did laundry and prepared lunch.

A state-agency physician performed a consultative exam in June 2009. He observed that Durr-Irving sounded mildly hoarse and in her right shoulder exhibited mild tenderness and a range of motion restricted by 10 degrees. He also opined that Durr-Irving's chronic obstructive pulmonary disease, asthma, and blood pressure were under control.

Later that month another state-agency doctor, David Bitzer, conducted a second consultative exam to assess Durr-Irving's residual functional capacity and concluded that her reported symptoms were disproportionate to the medical evidence. Dr. Bitzer observed that Durr-Irving walked around the office without difficulty and wasn't wheezing. In his opinion she could lift 25 pounds frequently and 50 pounds occasionally; sit, stand, or walk for a total of 6 hours each in an 8-hour workday with normal breaks; push and pull without limit; and occasionally reach overhead. He recommended, though, that she work in well-ventilated surroundings and avoid concentrated exposure to fumes, odors, dusts, and gases.

The Social Security Administration initially denied benefits in June 2009. Durr-Irving moved for reconsideration, urging that her previously identified conditions had worsened and adding that she recently had an abnormal mammogram and also suffers from insomnia, a persistent cough, and swelling in her right knee. Durr-Irving also notified the Social Security Administration that she had changed her primary care physician to Dr. Chukwudozie Ezeokoli. The denial of benefits was upheld on reconsideration in October 2009, and Durr-Irving requested a hearing before an ALJ.

At this point Durr-Irving still had not mentioned that urinary incontinence was contributing to her inability to work. But she submitted to the ALJ medical records documenting that she had been treated for urinary incontinence as early as 2001, while she still worked at Turtle Wax. (Urinary incontinence occurs when the bladder leaks with exertion or suddenly without warning, see *Urinary Incontinence, U.S. Nat'l Lib. of Med., MedlinePlus,* http://www.nlm.nih.gov/medlineplus/ency/article/003142.htm (last updated Nov. 7, 2014).) Those medical records show that Durr-Irving had started wearing adult diapers in 2005 to prevent leakage. In 2006 she had been diagnosed with a mild drop of the bladder floor. Then in June 2010, after her applications for benefits had been denied on reconsideration, a doctor at an outpatient clinic at Stroger Hospital prescribed Detrol to treat her overactive bladder, see *Detrol® LA, Pfizer,* http://www.detrolla.com/About-Detrol-LA (last visited Dec. 1, 2014). Durr-Irving saw a different doctor at a follow-up appointment in August 2010, two months prior to her hearing before the ALJ. During that second visit she reported no improvement: She was using the bathroom every 30 minutes during the day and 5 to 10 times at night, leaking urine when coughing, and changing her diaper 3 to 4 times a day. The doctor switched her prescription to imipramine, an antidepressant that may be useful in treating nighttime urinary incontinence, see *Imipramine, U.S. Nat'l Lib. of Med., MedlinePlus,* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682389.html (last visited Dec. 1, 2014). Durr-Irving again reported no improvement when she returned to the clinic a month later, so a third doctor tripled her daily dosage of imipramine.

At her hearing before the ALJ in October 2010, Durr-Irving elaborated on the extent of her ailments. She testified that she sleeps in her bedroom on the second floor of her house. Although she stated that she has no difficulty walking up the stairs to the bedroom, she also said that she can't walk more than half a block without growing tired, cannot stand for long periods, and becomes numb if she sits for too long. She confirmed the medical records documenting urinary incontinence, for which she wears adult diapers to prevent leaks between bathroom breaks every 30 minutes. But she acknowledged that medication is helping. She also explained that she uses inhalers daily to control her asthma, prescription medicines to control her blood pressure, and over-the-counter pain medicine to treat her shoulder pain, for which she hadn't seen a doctor in at least two years. Durr-Irving added that she was hospitalized for depression three years earlier, but since then had not been treated for depression.

A vocational expert also testified. The ALJ inquired about the work available to a hypothetical claimant of Durr-Irving's age, education (GED), and work experience who is limited to unskilled tasks and can lift and carry 10 pounds frequently and 20 pounds

occasionally, "stand and walk up to six hours in an eight hour day," and reach occasionally. The vocational expert said that the hypothetical person could work Durr-Irving's past jobs as a packer or machine feeder. When the ALJ asked if those jobs could be performed by someone who must have the option to sit or stand at will, the vocational expert said no but added that jobs still would be available in the regional economy as an office helper, cashier, or mail clerk. The vocational expert explained that a person employed in the latter jobs could be off task 10% of the time in addition to normal rest and break periods and could be absent one day each month. Durr-Irving's lawyer followed up by asking whether a person who needed to use the bathroom more than five minutes each hour could sustain those positions; the vocational expert replied no.

After the evidentiary hearing and before the ALJ issued a decision, Durr-Irving saw two more doctors, and she submitted treatment records for the ALJ to consider. Durr-Irving first saw her primary care physician of the last year, Dr. Ezeokoli, who she had been visiting every two months. Durr-Irving complained of worsening shortness of breath with exertion. But the doctor's examination revealed that Durr-Irving's chest was clear, she breathed without wheezing, and she showed "no symptoms of heart failure presently." The doctor also noted that Durr-Irving's last pulmonary function tests had not shown obstructive airway disease. Dr. Ezeokoli did prescribe an antidepressant for her reported feelings of depression and hopelessness.

The next week Dr. Ezeokoli assessed Durr-Irving's residual functional capacity. The doctor opined that Durr-Irving could sit continuously for 45 minutes and for a total of 2 hours in an 8-hour workday, stand continuously for 30 minutes, but not walk and stand for even 2 hours total during a workday. Dr. Ezeokoli added that Durr-Irving could occasionally twist, rarely bend, and never climb stairs or ladders. Finally, the doctor estimated that Durr-Irving's impairments would cause her to miss work more than four days a month and concluded that she was incapable of even "low stress" jobs because she gets winded easily.

Durr-Irving also visited Dr. Tondalaya Gamble, a urogynecologist (a gynecologist who specializes in treating pelvic floor disorders, see *Urogynecology, Advocate Ill. Masonic Med. Ctr.*, http://www.advocatehealth.com/immc/urogynecology (last visited Dec. 1, 2014)). Dr. Gamble diagnosed Durr-Irving with Stage II (of IV) pelvic organ prolapse, meaning that the bladder, urethra, or another pelvic organ protrudes toward or slightly through the opening of the vagina, frequently causing urinary problems, see *Vaginal/Pelvic Organ Prolapse, Cornell Urology*, https://www.cornellurology.com/clinical-conditions/female-urology-urogynecology/vaginal-prolapse/ (last visited Dec. 1,

2014). The doctor cut in half Durr-Irving's daily dose of imipramine and reinstated her prescription for Detrol.

The ALJ concluded, in a January 2011 decision, that Durr-Irving is not disabled. At Step 1 of the applicable 5-step analysis, *see* 20 C.F.R. § 404.1520(a)(4), the ALJ found that Durr-Irving had not engaged in substantial gainful activity since June 2008. At Step 2 the ALJ found that she suffers from asthma and "status post right rotator cuff repair," both impairments being severe. *See* 20 C.F.R. §§ 416.920(c), 404.1520(c). But the ALJ also concluded that Durr-Irving's hypertension, vocal-cord condition, urinary frequency, and alleged depression were not severe alone or in combination because, the ALJ said, these impairments did not cause more than minimal functional limitations. At Step 3 the ALJ concluded that Durr-Irving's asthma and rotator-cuff repair do not meet or equal a listed impairment.

The ALJ then found that Durr-Irving has the RFC to perform unskilled tasks in a workplace free of concentrated airborne pollutants but with the following limitations: She may miss one day of work monthly; be off task 10% of the time in addition to normal breaks to account for fatigue, pain, and depressed mood; lift and carry 10 pounds frequently and 20 pounds occasionally; sit for a total of 6 hours and stand or walk for a total of 6 hours in an 8-hour workday with the option to sit or stand at will; and occasionally reach above the shoulder with her right arm. The ALJ declined to accept Dr. Ezeokoli's RFC assessment because, the ALJ reasoned, Durr-Irving's medical history and the doctor's treatment notes are inconsistent with his "extremely limiting opinion." The ALJ noted, for example, that just one week before giving this unfavorable RFC assessment Dr. Ezeokoli had examined Durr-Irving and identified "negative objective findings" except for some tenderness in her right shoulder with otherwise "normal power globally." The doctor had also concluded that Durr-Irving's hypertension was under control. On the other hand, the ALJ accepted the agency doctor's determination that Durr-Irving could sit and stand or walk for 6 hours total. The ALJ discounted the state-agency doctor's opinion that Durr-Irving could lift 25 pounds frequently and 50 pounds occasionally, however, and credited instead her orthopedic surgeon's most-recent assessment that she could lift 10 pounds frequently and 20 pounds occasionally.

As for Durr-Irving's credibility, the ALJ declared that her testimony about the extent of her symptoms was not credible because it did not match the ALJ's own RFC assessment. In the ALJ's view her testimony about her right shoulder pain—which she contended limits her mobility—was not credible because she had not been treated for

that condition in the last two years and uses only over-the-counter medication to temper the pain. The ALJ also discounted Durr-Irving's testimony that pain prevents her from standing or walking for prolonged periods because "little objective medical evidence" corroborates this testimony.

Given the ALJ's RFC assessment, at Step 5 the ALJ concluded that Durr-Irving could not perform her past relevant work. But, relying on the vocational expert's testimony, the ALJ concluded that Durr-Irving could work as an office helper, a cashier, or a mail clerk.

II.

Because the Appeals Council denied review, we evaluate the ALJ's decision as the final word of the Commissioner of Social Security. *See Schomas v. Colvin,* 732 F.3d 702, 707 (7th Cir. 2013); *Shauger v. Astrue,* 675 F.3d 690, 695 (7th Cir. 2012).

Durr-Irving contends on appeal that the ALJ erred by failing to adequately consider the disabling effect of her urinary incontinence and whether she would need any additional off-task time at work. This error is material, Durr-Irving adds, because the vocational expert testified that a person who needs a bathroom break every half hour, as Durr-Irving testified, could not sustain full-time employment with her other limitations.

We agree with Durr-Irving that, given the medical evidence, her testimony, and the vocational expert's opinion, the ALJ was required to discuss why the testimony and medical evidence concerning Durr-Irving's urinary incontinence did not affect the ALJ's RFC assessment. "Although an ALJ need not mention every snippet of evidence in the record, the ALJ must connect the evidence to the conclusion" and cannot "ignore entire lines of contrary evidence." *Arnett v. Astrue,* 676 F.3d 586, 592 (7th Cir. 2012); *see Moore v. Colvin,* 743 F.3d 1118, 1123 (7th Cir. 2014); *Campbell v. Astrue,* 627 F.3d 299, 306 (7th Cir. 2010). Here, the ALJ recounted Durr-Irving's testimony about how frequently she uses the bathroom and experiences bladder leakage but said nothing about that testimony when analyzing Irving's impairments; the ALJ didn't *discredit* the testimony but instead ignored it altogether. Moreover, as Durr-Irving points out, the ALJ did not mention the medical records from her urogynecologist, who diagnosed Durr-Irving with Stage II pelvic organ prolapse. This evidence is highly relevant because the vocational expert testified that a person who must use the restroom more than once an hour would be unable to perform the few jobs that met the ALJ's assessment of Durr-Irving's RFC.

Because the ALJ did not discuss whether Durr-Irving's testimony about her urinary incontinency was credible or what significance, if any, the recent diagnosis of pelvic organ prolapse would have on her ability to sustain full-time employment, the ALJ did not adequately consider Durr-Irving's impairments. *See Arnett*, 676 F.3d at 592.

The Commissioner counters that any error was harmless because Durr-Irving's medical records show that she experienced urinary problems while she worked full-time at Turtle Wax, so the ALJ reasonably could have concluded that Durr-Irving's urinary incontinence was a longstanding problem that didn't prevent her from working. But this reasoning is nowhere in the ALJ's decision, and the Commissioner, by otherwise speculating about the ALJ's thinking, yet again violates doctrine of *SEC v. Chenery Corp.*, 318 U.S. 80 (1943) (limiting judicial review of agency proceeding to grounds identified in agency's decision). *See Hanson v. Colvin*, 760 F.3d 759, 762 (7th Cir. 2014) (collecting cases criticizing Commissioner for violating *Chenery* doctrine and warning that practice is sanctionable). In any event, even if that reasoning would have sufficiently justified *discounting* the disabling nature of Durr-Irving's problem, it would not justify entirely *ignoring* her testimony and Dr. Gamble's diagnosis. *See Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003) ("Evidence that Golembiewski's bladder impairments did not interfere with his work … would be a reason for the ALJ to discount the disabling nature of the problem, but it would not justify ignoring the problem entirely."); *Crowley v. Apfel*, 197 F.3d 194, 198–99 (5th Cir. 1999) (concluding that incontinence is impairment under Social Security Act that Commissioner must consider in determining whether claimant is disabled). This potential error would be harmless if we could predict with great confidence that the result on remand would be the same. *See McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011); *Spiva v. Astrue,* 628 F.3d 346, 353 (7th Cir. 2010). But given the medical evidence documenting Durr-Irving's worsening condition—a relevant consideration, *see Clifford v. Apfel*, 227 F.3d 863, 871 (7th Cir. 2000)—and the vocational expert's conclusion that Durr-Irving could not sustain full-time employment if she requires frequent bathroom breaks, we cannot conclude that the result would be the same. Moreover, the impact of Durr-Irving's urinary incontinence, in combination with her other impairments detailed above, is critical to her claim and must be addressed by the ALJ. *See* SSR 96-8p; *Yurt v. Colvin*, 758 F.3d 850, 860 (7th Cir. 2014).

III.

For the foregoing reasons, the judgment affirming the denial of benefits is REVERSED, and the case is REMANDED with instructions that it be returned to the Social Security Administration for further proceedings consistent with this order.